# In the United States Court of Federal Claims

No. 15-732C
(Filed:  June 25, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| TEJERE J. AKPENEYE et al., | \* | |
| | \* | |
| Plaintiffs, | \* | |
| | \* | Motions for Partial Summary Judgment; |
| v. | \* | Fair Labor Standards Act; Bona Fide Meal |
| | \* | Break; Portal-to-Portal Act; Donning and |
| THE UNITED STATES, | \* | Doffing; Overtime; Police Officers |
| | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Stephen G. DeNigris, Albany, NY, for plaintiffs.

Sarah Choi, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

        Plaintiffs—current and former Pentagon Force Protection Agency ("PFPA") officers—allege that they are entitled to overtime compensation for time spent (1) working during their meal breaks and (2) donning and doffing their uniform and equipment.  They seek to recover this unpaid overtime pay and other damages pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, as amended by the Portal-to-Portal Act of 1947 ("Portal Act"), id. § 251-262.  For reasons that will be addressed below, currently before the court are the claims of twenty sample plaintiffs ("plaintiffs").  Both parties have moved for summary judgment; plaintiffs seek partial summary judgment and defendant seeks summary judgment on all issues.  For the reasons stated below, the court (1) grants defendant's summary judgment motion as it pertains to compensation for meal breaks and denies plaintiffs' motion on that issue, and (2) denies both parties' motions as they relate to the donning-and-doffing claim.

## I.  FACTUAL BACKGROUND

        Except where noted, the facts relevant to the parties' motions for summary judgment are not in dispute.[1]  The facts are derived from the appendices attached to the parties' briefs, which

---

        [1]  It is axiomatic that the parties—not the court—bear the responsibility for combing the record and identifying facts supporting an argument.  Here, however, the task of identifying the undisputed facts and evaluating plaintiffs' arguments was made more difficult by plaintiffs' use of inaccurate citations.  Compare Pls.' Reply 8 ("A good many of [plaintiffs] testified that they

include documentary evidence; sworn statements from plaintiffs as a group, one of the named plaintiffs individually, and another from the PFPA's assistant chief of police; and transcripts from the depositions of plaintiffs and the PFPA's Chief Officer, Woodrow Kusse (who testified as a representative of the PFPA under Rule 30(b)(6) of the Rules of the United States Court of Federal Claims).[2]

## A. Job Location and Responsibilities

PFPA officers are generally responsible for security and law enforcement at the Pentagon reservation. See Answer ¶ 18. The Pentagon reservation covers approximately 238 acres and consists of administrative, transit, support, and industrial spaces. Def.'s Mot. Summ. J. ("Def.'s Mot.") App. 1 (Plummer Decl. ¶ 4). The Pentagon reservation includes the Pentagon, which houses a "shopping mall with retail stores, cafeterias, food courts, and fast food operations," as well as amenities such as a dry cleaner, post office, and fitness center. Id.

At the Pentagon reservation, PFPA officers are tasked with enforcing laws and regulations that are designed to protect people, safeguard property, and prevent breaches of the peace. Answer ¶ 19. As part of the job, officers are required to (1) perform inspections, (2) carry out surveillance, (3) protect officials at the Pentagon reservation, and (4) respond to (and contain) threats. Id. ¶¶ 20-21; Am. Compl. ¶¶ 20-21. Depending on where they are assigned, officers are responsible for making arrests, investigating complaints and accidents, responding to emergencies, patrolling specific areas, answering questions from the public, completing online-training courses, screening people and their bags, and monitoring vehicles that are coming and going. Pls.' Mot. App. 33 (Kusse Dep. 31:1-9) (arrests and investigations); id. at 109 (Kusse Dep. 107:4-19) (questions); Pls.' Resp. App. 13 (Antoine Dep. 45:11-14) (screening); id. at 55 (Allen Dep. 13:12-15) (vehicles); id. at 171 (Baker Dep. 35:6-10) (patrol); id. at 949 (Alpha-K Dep. 88:3-6) (emergencies); id. at 931 (Alpha-K Dep. 16:4-6) (training).

---

performed work assignments or were interrupted during every break period." (citing Pls.' Mem. Summ. J. ("Pls.' Mot.") App. 214-15 (Pls.' Decl. ¶ 3))), with Pls.' Mot. App. 214-15 (Pls.' Decl. ¶ 3) (listing items that plaintiffs were required to don before roll call). Compounding the issue, plaintiffs used excessively lengthy pin citations and failed to provide transcript page numbers when referencing appendix pages with multiple transcript pages. E.g., Pls.' Resp. Def.'s Summ. J. Mot. ("Pls.' Resp.") 17 n.7 (citing eighty-four pages of Officer Jonathan Allen's deposition transcript by referring to twenty-one appendix pages). Such citations are not helpful. Cf. United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). The court will strike future briefs in this case that do not include accurate and precise citations. See R. Ct. Fed. Cl. 5.4(a)(1).

[2] Many of the undisputed facts are reflected in submissions from both parties. Generally, the court will only provide one citation for each fact.

## B.  Work Schedule

The officers' work schedules are determined based on platoon assignment.  Each officer is assigned to one of six platoons, and the assignment determines when the officer's shift starts and whether the shift is 8.5 or 12.5 hours long.[3]  Def.'s Mot. App. 1-2 (Plummer Decl. ¶ 6). Officers assigned to an 8.5-hour shift work for ten days during the biweekly pay period while those with the 12.5-hour shift work seven days during the same pay period.  Pls.' Resp. App. 183 (Baker Dep. 82:18-83:4, 85:8-14).  If an officer works more than the normal hours, the officer can request overtime.  Def.'s Mot. App. 3 (Plummer Decl. ¶ 16).  Some plaintiffs testified that their requests for overtime pay have never been denied.  E.g., Pls.' Resp. App. 451 (Clute Dep. 40:13-15).

## C.  Start of Shift

Every officer's shift starts at roll call, which occurs in the Pentagon's Library and Conference Center.  Def.'s Mot. App. 3 (Plummer Decl. ¶ 21) (shift start); Pls.' Mot. App. 47 (Kusse Dep. 45:9-15) (location).  During roll call, officers are provided important details concerning their duties and schedule for the day.  Def.'s Mot. App. 2 (Plummer Decl. ¶¶ 7-8).

### 1.  Uniform

At the beginning of roll call, officers must be in their standard uniform.  Id. at 3 (Plummer Decl. ¶ 21).  The PFPA requires the standard uniform because officers must present a professional appearance; the uniform guidelines were established because officers need "to present a professional public perception . . . ."  Pls.' Mot. App. 236 (PFPA memorandum on uniforms).  Indeed, "[t]he quasi-military nature of policing and the need for visibility in the basic police function requires uniformity in appearance."  Def.'s Mot. App. 16 (uniform policy).

The standard uniform generally consists of both clothing and equipment.  Specifically, the officers' standard uniform consists of a specific clothing (pants, shirt, boots, and badge); baton; gun belt; gas mask; trauma kit; pepper spray dispenser; bulletproof vest; pair of handcuffs; sidearm and ammunition; and pair of puncture proof gloves.[4]  Pls.' Mot. App. 214-15 (Pls.' Decl. ¶ 3).  Other than the clothing (including the badge) and bulletproof vest, the components of the standard uniform are either carried or included on a duty belt worn by the officers.  See id. at 62 (Kusse Dep. 60:11-19).  Other than the standard uniform, plaintiffs are not required to have or wear any other items during roll call.  Pls.' Resp. App. 452 (Clute Dep. 44:3-5).  Indeed, an officer stationed at a post requiring special gear that is not part of the standard uniform, such as a tactical service weapon, can retrieve the item after roll call from either a post lockbox or an armory located next to the roll call room.  Def.'s Mot. App. 4 (Plummer Decl. ¶ 24).

---

[3]  For example, Platoon 1 works from 6:00 a.m. to 6:30 p.m., and Platoon 2 works from 6:00 p.m. to 6:30 a.m.  Def.'s Mot. App. 1-2 (Plummer Decl. ¶ 6).

[4]  Depending on the work site or weather, outerwear as well as a protective helmet and shoes may also be part of the standard uniform.  Pls.' Mot. App. 214-15 (Pls.' Decl. ¶ 3).

Prior to mid-September 2001, officers could not don or doff part of their standard uniform at home because their sidearms were kept at the Pentagon's armory.  See Pls.' Mot. App. 261 (Miller Decl. ¶¶ 9, 13).  But in the days after the September 11, 2001 terrorist attack at the Pentagon, officers received permission—later codified in a PFPA regulation—to keep their sidearm when they went home.  Id. at 42 (Kusse Dep. 40:3-15).  The PFPA implemented this policy so that officers could (1) report to duty armed and ready to respond to emergencies and (2) stay safe during their travel to and from work in their standard uniform.  Id. at 242 (PFPA weapon regulation).  Some officers have chosen to don and doff the standard uniform at home for convenience.  E.g., Pls.' Resp. App. 363 (Byrnes 116:12-22); see also id. at 501 (Cousin Dep. 84:10-18) (explaining that some officers change at home because they have a long commute).  When they do so, donning the clothing takes ten minutes and donning the equipment takes an additional ten minutes, with an equal amount of time to doff.  See Pls.' Mot. App. 215 (Pls.' Decl. ¶ 5).  Some officers, however, have chosen to don and doff their entire standard uniform at the Pentagon reservation.  See id.  Plaintiffs choosing to do so expressed a concern that wearing their uniform to work was unsafe, e.g., Pls.' Resp. App. 897 (Bell Dep. 77:12-18); see also id. at 501 (Cousins Dep. 83:18-84:9) (expressing concern regarding people breaking into officers' cars and taking the gun or body armor), with one plaintiff testifying that the PFPA even advised officers to avoid driving in their uniform because of safety concerns, id. at 405 (Bradley Dep. 84:18-85:6).  If an officer chooses to don and doff the standard uniform at the Pentagon reservation, then the donning and doffing process takes at least an additional ten minutes—five extra minutes to retrieve a side arm from the armory and at least that long to return it.  Pls.' Mot. App. 215 (Pls.' Decl. ¶¶ 4, 6).

## 2.   Post Location

An officer is not always assigned to the same post; officers rotate among different assignments.  See, e.g., Pls.' Resp. App. 508 (Cousins Dep. 111:10-16).  During roll call, officers are provided with details regarding their job for the day.  Officers are given a "beat sheet" showing where they will be working that day and when they can take their breaks.  Def.'s Mot. App. 2 (Plummer Decl. ¶¶ 7-8).  The officers may be assigned to an interior post, an exterior post, or a patrol unit.  Pls.' Mot. App. 28 (Kusse Dep. 26:3-20); see also Pls.' Resp. App. 56-57 (Allen Dep. 17:16-18:17).  If not assigned one of those posts, an officer may be a "breaker"; breakers work at different posts during a shift because their job is to take the place of an officer during his or her break.  Pls.' Resp. App. 119-20 (Akpeneye Dep. 33:19-34:4). Officers might have to drive to a post if it is located on the Pentagon reservation but not inside or next to the Pentagon.  Id. at 59-60 (Allen Dep. 28:10-29:22, 30:9-18).

Officers are provided time to get to their post following roll call.  Depending on the platoon assignment, officers are required to be at their post either thirty minutes or one hour after the start of their shift (not the end of roll call).  Def.'s Mot. App. 3 (Plummer Decl. ¶ 22).  Because the roll call process lasts between ten and fifteen minutes, Pls.' Resp. App. 453 (Clute Dep. 46:18-20), officers have between fifteen and fifty minutes to get to their posts after roll call, see Def.'s Mot. App. 3 (Plummer Decl. ¶ 22).  After their shifts, officers are required to return

any special gear to the armory or lockbox at the post, and doff their standard uniforms.  See Pls.'
Mot. 215 (Pls.' Decl. ¶¶ 4, 6).

### D.  Breaks

### 1.  Compensation Policy

Officers have been subject to two different break policies:  one that included paid meal
breaks and one that did not.  The first policy was in effect prior to July 2013.  Before July 2013,
officers were supposed to work eight-hour shifts that included a paid meal break.[5]  Def.'s Mot.
App. 2 (Plummer Decl. ¶ 14).  But due to reasons not explained by the parties, the schedules
changed to the point that some officers were not working eight-hour shifts or receiving a paid
meal break.  Id.  The PFPA began developing a new policy to (1) address the disparate
compensation caused by some, but not all, officers receiving an unpaid break and (2) prepare for
the implementation of an administrative furlough.  Id. at 3 (Plummer Decl. ¶ 14); id. at 28
(Director's Feedback Line[6]).  As part of the development process, the PFPA researched the law
and consulted with various agencies.  Id. at 3 (Plummer Decl. ¶ 16).  Specifically, the PFPA
reviewed regulations and guidance from the United States Department of Labor ("DOL"), United
States Department of Defense, and United States Office of Personnel Management ("OPM"),
while also consulting with "the Office of General Counsel and the Washington Headquarters
Services Human Resources Office of Labor Management and Employee Relations."  Id. at 3
(Plummer Decl. ¶¶ 16-17); see also id. at 28, 30 (noting specific statutes, regulations, and
decisions that were reviewed).

After that research and consultation, the PFPA implemented a new policy in July 2013:
officers' meal breaks would be noncompensable.  Pls.' Mot. App. 202 (union grievance).
Officers now work either 8.5-hour shifts (with two thirty-five-minute breaks) or 12.5-hour shifts
(with three forty-minute breaks), and the officers are compensated for the entire shift except for a
thirty-minute-meal break that may be taken during any break.  Def.'s Mot. App. 2 (Plummer
Decl. ¶¶ 8-9).  If an officer is required to perform compensable work that is not de minimis
during the break, the PFPA's policy provides that the officer can request overtime compensation,
id. at 3 (Plummer Decl. ¶ 16), and plaintiffs testified that such requests have not been denied,
e.g., Pls.' Resp. App. 451 (Clute Dep. 40:13-15).

Shortly after the new policy was implemented, the officers' union filed a grievance
concerning the unilateral implementation of the unpaid meal period.  Pls.' Mot. App. 202-03
(grievance).  The union argued that the new policy violated overtime laws:  the meal breaks are
not bona fide meal breaks, and thus are compensable, because the officers are not completely

---

[5]  The shift length was codified in a collective bargaining agreement while the paid break
was implemented as a matter of administrative convenience.  Def.'s Mot. App. 2 (Plummer Decl.
¶ 14).

[6]  The Director's Feedback Line is an Internet-based system that allows the PFPA (via the
PFPA Director) to answer questions officers submit outside the chain of command.  Pls.' Mot.
App. 97 (Kusse Dep. 95:9-15).

relieved of duty.  Id.  Specifically, the union highlighted that officers are subject to numerous restrictions that preclude them from attending to private business; during breaks, officers must stay in their uniform, be available by radio, and respond to calls for service.  Id.

### 2.  Use of Break Time

#### a.  Generally

The parties have not argued, nor does the record suggest, that the changes in compensation policies altered how officers spend their breaks.  Officers are not required to eat during a break, Pls.' Mot. App. 117 (Kusse Dep. 115:9-11); they can spend their time almost anywhere on the Pentagon reservation, which includes various amenities and two breakrooms closed to the public, see Pls.' Resp. App. 77 (Allen Dep. 98:6-9) (discussing breakrooms); Def.'s Mot. App. 1 (Plummer Decl. ¶ 4).  The breakrooms contain microwaves and refrigerators, as well as places to sit and eat for up multiple people.  Pls.' Resp. App. 77 (Allen Dep. 98:16-21).

#### b.  Restrictions

Nevertheless, officers on break are subject to some restrictions on what they can do with their time.  Officers are not permitted to remove their uniforms or leave the Pentagon reservation during breaks.  Pls.' Mot. App. 213-14 (Pls.' Decl. ¶ 1); Pls.' Resp. App. 64 (Allen Dep. 48:4-14).  Officers also must avoid acting in a manner during their breaks that could leave the public with negative perceptions because the public does not know when an officer is on a break.  Pls.' Mot. App.  at 117-18 (Kusse Dep. 115:19-116:8).  This policy restricts officers' activities in public but not the breakrooms or private areas.  See id. at 123-24 (Kusse Dep. 121:14-122:4).  Accordingly, officers must limit when they publicly congregate with other officers and cannot spend time in public having their shoes shined, watching YouTube videos, or playing a video game.  Id. at 116-18, 123-24 (Kusse Dep. 114:5-13, 115:16-19, 116:1-13, 121:14-122:4); see also id. 210 (explaining in a Director's Feedback Line that "officers may socialize during official breaks . . . [but must] be mindful of remaining in the food courts or other public areas for extended time periods, as this may be viewed negatively by those not familiar with break procedures"); Pls.' Resp. App. 71 (Allen Dep. 74:14-15) ("[W]e are not allowed to congregate out in the open in any of these restaurants.").

#### c.  Duties

In addition to the above restrictions, officers have duties while they are on break.[7]  Officers must remain vigilant, Pls.' Mot. App. 39 (Kusse Dep. 37:14-18), and be in a state of readiness prepared to address any contingencies or emergencies that arise, Def.'s Mot. App. 2 (Plummer Decl. ¶ 13).  This policy is for national security as well as the safety of the public and

---

[7]  The parties do not agree on whether officers' break time is spent on call, on duty, or on some variation of the two.  Def.'s Reply 15 (disputing plaintiffs' characterization that the officers remain on duty).  The significance of this disagreement will be addressed in Section IV.C.2.a, infra.

officers.  Pls.' Mot. App. 143 (Kusse Dep. 141:5-7).  As a result of this policy, officers may be asked to respond during their breaks to situations such as a traffic stop or medical emergency.  Pls.' Resp. App. 946 (Alpha-K Dep. 75:15-20) (traffic); id. at 205 (Baker Dep. 172:21-173:9) (medical).  These types of events occur frequently at the Pentagon reservation, id. at 957 (Alpha-K Dep. 121:11-16), and officers sometimes inform the PFPA when these events occur during a break, compare id. (Alpha-K Dep. 120:20-121:2) (relying on dispatch to record emergencies unless the officer is required to prepare a report), with id. at 763 (Banks Dep. 54:7-12) (reporting every medical-assistance event over the radio).

    Related to the requirements to remain vigilant and in a state of readiness, officers must constantly monitor their radios while on break because many of the emergencies or contingencies are communicated over the radio by dispatch.  Id. at 27 (Antoine Dep. 98:6-99:2).  Until recently, officers were also required to monitor their radios for hourly status checks:  every hour on the hour, a lieutenant would call out each officer's name over the radio, and the officer was required to promptly respond with his or her location.  Id. at 29 (Antoine Dep. 108:17-20, 109:17-22).  The PFPA implemented the radio checks, at least in part, for officer safety after the PFPA lost track of officers who prematurely left their posts; however, the policy was recently suspended because the radio checks interfered with operations by clogging the radio bandwidth.  Pls.' Mot. App. 106 (Kusse Dep. 104:5-11) (implementation rationale); id. at 77 (Kusse Dep. 75:19-22) (suspension justification); see also Pls.' Resp. App. 30 (Antoine Dep. 111:7-112:18) (acknowledging and questioning the PFPA's official explanation for conducting radio checks).  One plaintiff was asked to comment on the suspension, and he testified that he did not even recognize that the PFPA stopped the radio checks.  Pls.' Resp. App. 80 (Allen Dep. 112:6-9).

    Officers on break must respond to questions from members of the public or employees at the Pentagon reservation.  Id. at 135 (Akpeneye Dep. 94:10-14); see also Pls.' Mot. App. 213 (Pls.' Decl. ¶ 1) (noting the obligation to respond to police inquiries).  For example, officers may be required to provide directions or answer requests for assistance.  Pls.' Mot. App. at 109 (Kusse Dep. 107:4-19).  These interactions vary in length; an officer could give a short answer taking under a minute or spend ten minutes walking an individual to an area.  Pls.' Resp. App. 74 (Allen Dep. 86:6-17).  Officers generally do not record these interactions or report them to a supervisor, id. at 763 (Banks Dep. 54:13-22, 56:10-15), and these types of interruptions occur during a break on many—but not all—days, Pls.' Mot. App. 214 (Pls.' Decl. ¶ 2).

    During some breaks, officers also perform three categories of administrative tasks.  The first category involves processing paperwork; officers occasionally use some of their break time to write reports, sign personnel forms, complete time sheets, or check their work-electronic-mail account ("email").  Pls.' Resp. App. 117-18 (Akpeneye Dep. 25:19-26:1).  Officers must write reports for incidents they are involved with at the Pentagon reservation, such as confiscating a knife or responding to a medical emergency.  Id. at 520-21 (Cousins Dep. 161:12-162:14).  These reports are prepared during breaks and take between thirty and forty-five minutes to complete.  Id. at 521 (Cousins Dep. 164:15-20).  Officers are not required to prepare a report every day; indeed, Officer David Cousins, the only plaintiff to address how often reports are prepared, testified that he prepared thirty-three reports over a multiyear period in which he

worked more than thirty-three shifts.[8]  Id. at 522 (Cousins Dep. 166:1-6, 166:17-22); see also Pls.' Suppl. Br. 1, 3 (explaining that Officer Cousins's deposition testimony is the only place in the record providing details regarding the reports).  Nonetheless, officers spend break time writing a report almost every day or at least once per week.  Pls.' Mot. App. 214 (Pls.' Decl. ¶ 1).

        In addition to the reports, officers have other paperwork tasks.  Either monthly or quarterly, officers must read and sign personnel forms after talking with a supervisor for a couple of minutes.  Pls.' Resp. App. 507 (Cousins Dep. 109:18-21) (monthly); id. at 722 (Johnson Dep. 133:7-17) (quarterly).  The personnel forms document the officers' performance and are also used to determine bonuses.  Id. at 722 (Johnson Dep. 133:8-11).  Officers also must complete online time sheets every two weeks, which takes approximately ten to fifteen minutes.  Id. at 78 (Allen Dep. 103:4-21) (frequency and length); id. at 504 (Cousins Dep. 97:12-21) (online).  Officers have to check their email at least twice per shift and use break time to do so multiple times per week (but not every day).  Pls.' Mot. App. 214 (Pls.' Decl. ¶ 2) (use of break time); Pls.' Resp. App. 810 (Case Dep. 103:8-10) (checking email).  Officers have the option of completing these tasks (other than the personnel forms) while at a post with a computer, Pls.' Resp. App. 12 (Antoine Dep. 39:17-40:4), but often need to use break time to complete the tasks because of interruptions during the day, id. at 82-83 (Allen Dep. 120:22-122:13).[9]  The frequency with which officers perform these tasks during breaks varies by the person; for some,

---

        [8]  Plaintiffs disagree with this reading of the deposition transcript.  First, plaintiffs assert that Officer Cousins testified that the thirty-three reports shared as an exhibit during his deposition did not reflect all the reports he produced.  The thirty-three reports, however, reflect all of the reports that he prepared during the time period before the PFPA switched to a new reporting system.  Pls.' Resp. App. 519, 522 (Cousins Dep. 157:1-16, 166:17-167:12).  Second, plaintiffs contend that officers generally complete one report on most shifts because Officer Cousins said that "every shift is writing reports on a daily – every shift writes reports on a daily basis."  Id. at 522 (Cousins Dep. 166:5-6).  Read in context, the statement reflects Officer Cousins's belief that reports are written every shift rather than every officer writes a report every shift.  See id. at 521-22 (Cousins Dep. 165:16-166:6) (focusing on which shifts are busier).  This reading is bolstered by the fact that Officer Cousins proceeded to testify that he wrote thirty-three reports over multiple years and did not write a report every day.  Id. at 522 (Cousins Dep. 167:7-12).

        [9]  Although Officer Allen's deposition testimony contradicts his earlier averment that tasks requiring a computer "could only [be] accomplish[ed] on our breaks," Pl. Mot. App. 214 (Pls.' Decl. ¶ 1), the court discerns that his later testimony was fleshing out the nuances of a complex situation, see Pls.' Resp. App. 80-81 (Allen Dep. 113:13-115:11) (responding to a question concerning the declaration by explaining that there is no blanket prohibition but officers have limitations on their ability to use computers at posts).  Therefore, the two statements do not indicate a factual dispute.  Cf. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[Lower courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

the responsibilities required using break time most days, while others needed to do so less
frequently.  See Pls.' Mot. App. 214 (Pls.' Decl. ¶ 2).

        The second category of administrative responsibilities is mandatory training.  The
training consists of at least eight (and maybe up to twenty) courses, which each last between 20
to 180 minutes and must be completed at the Pentagon reservation.  Pls.' Resp. App. 342 (Byrnes
Dep. 32:21-33:6) (stating that there are eight courses); id. at 489 (Cousins Dep. 34:16-20)
(providing a "ballpark estimate" of ten to twenty courses); id. at 296 (Case Dep. 18:22-19:5)
(estimating courses are between twenty and sixty minutes); id. at 447 (Clute Dep. 23:3-10)
(estimating courses are between 30 and 180 minutes).  The courses are assigned throughout the
year; officers are notified at least seven days and up to nearly one year in advance of when the
course must be completed.  See id. at 617 (Fox Dep. 19:5-15) (seven days to one month); id. at
446 (Clute Dep. 21:11-18) (one month to nearly one year).  As with the other computer tasks
described above, officers can either complete the training courses at posts with a computer or use
computers in the private areas during a break.  Id. at 489 (Cousins Dep. 35:9-18).  At least some
of the training courses can be started, paused, and resumed at a later time or location.  Id. at 77
(Allen Dep. 101:18-22); see also id. at 348 (Byrnes Dep. 54:7-17) (noting that he was unable to
pause at least one training course); id. at 446-47 (Clute Dep. 21:19-22:2) (stating that he has
paused and later resumed training courses).  Officers review or study online training materials
during breaks multiple times per week, with some doing so nearly every day.  Pls.' Mot. App.
214 (Pls.' Decl. ¶¶ 1-2).

        The third category of administrative tasks involves vehicle maintenance.  These tasks
only apply to officers who are stationed with a vehicle or provided one for use during a break.
Officers must refuel their assigned vehicle, which takes about ten to fifteen minutes and
generally occurs once per shift.  Pls.' Resp. App. 19-20 (Antoine Dep. 68:12-69:3, 70:9-10,
71:14-21,  73:18-20).  Officers will refuel their assigned vehicle when they have time to do so,
which may be during a break.  Id. at 397 (Bradley Dep. 50:3-13).  While refueling, officers
occasionally buy food at a nearby store.  Id. at 566 (Cumberbatch Dep. 49:8-16); see also id. at
450 (Clute Dep. 36:22-37:2) (stating officers are allowed to buy food[10]).  In addition to refueling,
officers spend around five minutes during a break inspecting their assigned vehicle for any
damage.  Id. at 189 (Baker Dep. 109:6-9) (time); id. at 190 (Baker Dep. 111:2-10) (inspection).
Depending on the officer, these tasks must be performed during breaks on an almost daily basis
or less frequently.  Pls.' Mot. App. 214 (Pls.' Decl. ¶ 2).

---

        [10]  Some plaintiffs averred that officers should not (or were not permitted to) stop for
food.  E.g., Pls.' Resp. 363 (Byrnes Dep. 115:20-116:6).  The plaintiffs who averred that they
could not stop for food did so in the context of explaining that they could not make additional
stops specifically to buy food.  E.g., id. (Byrnes Dep. 114:20-22) ("[W]e were to go and fuel our
vehicle and come straight back with no stops in between."); id. at 396 (Bradley Dep. 49:15-16)
("You're not supposed to stop for food.").  The inability to make additional stops does not
conflict with the other plaintiffs' testimony that officers already stopped for refueling can buy
food at nearby locations.

Plaintiffs aver that their duties as PFPA officers require them to perform work-related tasks during breaks that take up a "substantial amount of time." Id. at 213 (Pls.' Decl. ¶ 1). But plaintiffs also testified during their depositions that they could not recall a shift where they were interrupted during every break.[11] E.g., Pls.' Resp. App. 902 (Bell Dep. 95:11-18). Indeed, plaintiffs signed a sworn declaration stating that they were not interrupted during their breaks on a daily basis. Pls.' Mot. App. 214 (Pls.' Decl. ¶ 1).

## II. PROCEDURAL HISTORY

Based on the circumstances described above, a group of PFPA officers, on behalf of themselves and similarly situated employees, filed a lawsuit the group styled as a collective action alleging violations of the FLSA, as amended by the Portal Act. The officers plead two claims, which are both premised on the PFPA allegedly violating the FLSA by failing to pay officers for all of the time they worked. Specifically, the officers allege in their first claim that they are entitled to compensation for their meal breaks because they spend that time predominantly for the PFPA's benefit. In the second claim, officers allege that that the PFPA violates the FLSA by failing to pay officers for the time they spend donning and doffing their standard uniform. To remedy these alleged statutory violations, the officers request that the court (1) allow the case to proceed as a collective action; (2) order an accounting of the officers' lost wages; (3) enjoin the PFPA from continuing to commit the alleged unlawful practices; and (4) order the payment of unpaid overtime, liquidated damages, and statutory penalties as well as costs, interest, and attorney's fees.

After defendant filed its answer denying the substance of the officers' claims, the court accepted the parties' proposal to bifurcate the litigation. The first phase would involve the parties selecting twenty sample officers (as noted above, this group is referred to as "plaintiffs" in this decision) and litigating those officers' claims. The second phase would begin after a decision was reached on plaintiffs' claims. During the second phase, the court would determine whether plaintiffs are representative of the remaining officers such that the decision reached with respect to plaintiffs should be applied to the remaining officers.

After selecting plaintiffs and completing discovery on their claims, both parties moved for summary judgment. Defendant moved for summary judgment on all the issues. Plaintiffs filed a motion for partial summary judgment seeking a decision on all the issues except for liquidated damages related to the donning-and-doffing claim. These motions concerning plaintiffs' claims are fully briefed and ripe for adjudication. The court deems oral argument unnecessary for resolving the motions.

---

[11] Officer Michael Baker testified that he was interrupted during every break. Pls.' Resp. App. 195 (Baker Dep. 132:18-21). When asked follow-up questions, Officer Baker clarified that he was only interrupted that frequently when assigned to certain platoons and had some assignments where he was not interrupted every break. Id. (Baker Dep. 133:6-10).

## III.  LEGAL STANDARDS

The parties have moved for summary judgment on plaintiffs' claims implicating the FLSA, as amended by the Portal-to-Portal Act.

### A.  Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  R. Ct. Fed. Cl. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex, 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  R. Ct. Fed. Cl. 56(c)(1)(B).  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

The court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues." (citation omitted)).

**B. Fair Labor Standards Act**

The FLSA governs, among other issues, overtime compensation.  The FLSA makes it unlawful for an employer to "employ" an employee for a workweek longer than forty hours unless the employee receives overtime compensation for the time spent employed in excess of forty hours.  See 29 U.S.C. § 207(a) (2012).  But "Congress recognized that certain jobs are not easily susceptible to the workweek method of wage and time calculations, and therefore provided special calculation methods for . . . law enforcement."  Wethington v. City of Montgomery, 935 F.2d 222, 224 (11th Cir. 1991).  Under what is known as the section 7(k) exemption, law enforcement officers are entitled to overtime when they are employed for a workweek longer than 171 hours in a twenty-eight-day period or exceed a proportional number of hours during a pay period shorter than twenty-eight days.  29 C.F.R. § 553.201 (2017); see also 29 U.S.C. § 207(k) (permitting the Secretary of Labor to promulgate regulations setting different hour requirements for law enforcement officers to accrue overtime compensation).

Overtime eligibility for both law enforcement and other types of employees turns on the term "employ," which means "to suffer or permit to work."  29 U.S.C. § 203(g); see also id. § 207(a) (conditioning overtime eligibility on whether the employee is employed to work more than a designated number of hours).  The FLSA, however, does not contain a definition of "work."  See id. § 203 (definitions).  This gap has been filled by the United States Supreme Court ("Supreme Court"), which has interpreted the term to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  IBP, Inc. v. Alvarez, 546 U.S. 21, 25 (2005).  Under the regulatory framework established by the OPM and DOL—"the two separate agencies [that] interpret the FLSA exemption provisions," Baca v. United States, 29 Fed. Cl. 354, 359 (1993)—"[h]ours of work means all time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency," 5 C.F.R. § 551.104 (2017); see also 29 C.F.R. pt. 785 (addressing hours worked).  Such time includes "(1) [t]ime during which an employee is required to be on duty; (2) [t]ime during which an employee is suffered or permitted to work; and (3) [w]aiting time or idle time which is under the control of an agency and which is for the benefit of an agency."  5 C.F.R § 551.401(a).

As a general matter, the OPM's regulations, which are codified in title 5 of the Code of Federal Regulations, technically apply to plaintiffs' claims because plaintiffs are federal employees.  29 U.S.C. § 204(f).  But courts addressing federal employees' FLSA claims have also considered the DOL's regulations because the OPM's application of the FLSA must be consistent with the DOL's regulations.  See Billings v. United States, 322 F.3d 1328, 1334 (Fed. Cir. 2003) (noting that the OPM's guidelines must be in harmony with the FLSA's purpose and DOL regulations); Havrilla v. United States, 125 Fed. Cl. 454, 463 (2016) (reviewing DOL and OPM regulations).  The regulations that the DOL has promulgated regarding the FLSA are interpretative regulations (otherwise known as interpretive bulletins).[12]  Babcock v. Butler Cty.,

---

[12]  The interpretative nature of the regulations is confirmed by their location in subchapter B, which is titled "STATEMENTS OF GENERAL POLICY OF INTERPRETATION NOT DIRECTLY RELATED TO REGULATIONS."  29 C.F.R. subch. B.  The DOL also

806 F.3d 153, 157 n.7 (3d Cir. 2015) (noting that 29 C.F.R. § 785.15 and the associated regulations are interpretive regulations); see also Haviland v. Catholic Health Initiatives-Iowa, Corp., 729 F. Supp. 2d 1038, 1055 (S.D. Iowa 2010) ("[C]ourts considering the import of § 785.19 have noted that it is merely an 'Interpretive Bulletin' . . . ."). Given their interpretative nature, the applicable regulations are not binding but are entitled to respect to the extent that they have the power to persuade. See Skidmore, 323 U.S. at 139-40.

## C.  Portal-to-Portal Act

The Portal Act is the starting point for determining whether plaintiffs' time spent donning and doffing clothing before the start of their shift is work. See Alvarez, 546 U.S. at 24. Following judicial decisions applying a broad definition of "work" under the FLSA, Congress enacted the Portal Act to narrow the definition by excluding specific activities. See id. at 27. The Portal Act is primarily concerned with defining the beginning and ending of the work day, id. at 34-37; the law "distinguishes between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence performed for an employer,' on the other hand," Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 520 (2014) (Sotomayor, J., concurring) (citing 29 C.F.R. § 790.8(a) (2014)).  More specifically, the Portal Act creates exceptions to the general rule—set forth in the FLSA—that employees must be paid for activities performed for, and under the direction of, the employer. Bobo v. United States, 136 F.3d 1465, 1467 (Fed. Cir. 1998).

## D.  Damages

If the court finds that the PFPA failed to pay plaintiffs overtime compensation to which they were due, then plaintiffs are entitled to "the amount of . . . their unpaid overtime compensation" as damages.  29 U.S.C. § 216(b).  Moreover, the court may award plaintiffs "an additional equal amount as liquidated damages," id., although a determination "that the plaintiffs are entitled to recover overtime pay . . . do[es] not automatically entitle plaintiffs to liquidated damages," Beebe v. United States, 640 F.2d 1283, 1295 (Fed. Cir. 1981).

The employer has the burden of showing that liquidated damages are not warranted. Adams v. United States, 350 F.3d 1216, 1226 (Fed. Cir. 2003).  Specifically, the employer must show "that the act or omission giving rise to [the violation of the FLSA] was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260.  The good-faith requirement is subjective; the

---

acknowledges that the regulations applicable here—those addressing hours worked in part 785— are meant to be persuasive rather than controlling:  "The ultimate decisions on interpretations of the act are made by the courts.  The Administrator must determine in the first instance the positions he will take in the enforcement of the Act.  The regulations in this part seek to inform the public of such positions."  29 C.F.R. § 785.2; see id. (noting that the regulations provide a guide for how the office will apply the law); see also Chao v. Gotham Registry, Inc., 514 F.3d 280, 288 (2d Cir. 2008) ("The long-standing regulations in Part 785 reflect the [DOL]'s expertise on interpretive questions that are essential to the administration of the [FLSA].")

employer must show "an honest intention to ascertain what the [FLSA] requires and to act in accordance with it." Beebe, 640 F.2d at 1295 (quoting Addison v. Huron Stevedoring Corp., 204 F.2d 88, 93 (2d Cir. 1953)).  In contrast, the reasonable grounds requirement is objective; the inquiry "calls for a determination as to whether the employer had reasonable grounds for believing that his act or omission was in compliance with the Act, and this is a requirement that involves an objective standard." Id.  "Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." Id.  If the employer does not satisfy the objective and subjective components, then the award of liquidated damages is mandatory. See Angelo v. United States, 57 Fed. Cl. 100, 104 (2003) (discussing the interplay between 29 U.S.C. § 216(b) and § 260); accord 29 C.F.R. § 790.22(b).  If the employer satisfies both components, then "the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [29 U.S.C. §] 216 . . . ." 29 U.S.C. § 260.

## IV.  MEAL BREAK CLAIM

Plaintiffs first argue that they are owed unpaid overtime compensation pursuant to the FLSA because they are not compensated for all of the time they spend on break despite continuing to work.  More specifically, plaintiffs assert that they are entitled to payment for their meal breaks because the breaks do not qualify as bona fide meal breaks under the FLSA.

### A.  Bona Fide Meal Breaks

As interpreted by the courts, the FLSA does not require employees be compensated for time spent on a bona fide meal break because such time is not work time. See Havrilla, 125 Fed. Cl. at 464.  The OPM has not issued regulations fleshing out the concept of meal breaks, but the DOL has promulgated two interpretive regulations on the issue that are instructive. See id. at 463.  The first regulation applies to employees in general and provides:

> (a) Bona fide meal periods.  Bona fide meal periods are not worktime.  Bona fide meal periods do not include coffee breaks or time for snacks.  These are rest periods.  The employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions.  The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.  For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating. . . .

> (b) Where no permission to leave premises.  It is not necessary that
> an employee be permitted to leave the premises if he is
> otherwise completely freed from duties during the meal period.

29 C.F.R. § 785.19.  The second regulation, which incorporates the first by reference, applies to
state or local government agencies using the section 7(k) exemption for law enforcement and
provides:

> If a public agency elects to use the section 7(k) exemption,
> the public agency may, in the case of law enforcement personnel,
> exclude meal time from hours worked on tours of duty of 24 hours
> or less, provided that the employee is completely relieved from
> duty during the meal period, and all the other tests in § 785.19 of
> this title are met.  On the other hand, where law enforcement
> personnel are required to remain on call in barracks or similar
> quarters, or are engaged in extended surveillance activities (e.g.,
> "stakeouts"), they are not considered to be completely relieved
> from duty, and any such meal periods would be compensable.

Id. § 553.223(b); see id. pt. 553 (addressing application of the FLSA to state and local
governments).  Simply stated, both regulations provide that compensation is not required for
meal breaks when an employee is completely relieved from duty.  Avery v. City of Talladega, 24
F.3d 1337, 1346 (11th Cir. 1994); see also Alexander v. City of Chi., 994 F.2d 333, 336-37 (7th
Cir. 1993) (suggesting that the two regulations put forth the same standard).  The DOL
acknowledges, however, that "[t]he ultimate decisions on interpretations of the [FLSA] are made
by the courts."  29 C.F.R. § 785.2 (citing Skidmore, 323 U.S. at 138).

With regard to meal breaks, courts overwhelmingly have declined to apply a literal
reading of the DOL's "complete relief" standard and instead use a different test:  determining
whether the employer or employee predominantly benefits from the meal period.[13]  See Havrilla,
125 Fed. Cl. at 464 (collecting cases from other jurisdictions).  But see Kohlheim v. Glynn Cty.,
915 F.2d 1473, 1477 n.20 (11th Cir. 1990) (adopting a literal reading of the standard set forth in
29 C.F.R. § 785.19).  Courts applying this standard "require[] remuneration for meal periods
during which a police officer is unable to comfortably and adequately pass the mealtime because
the officer's time or attention is devoted primarily to official responsibilities."  Alexander, 994
F.2d at 337; accord Lamon v. City of Shawnee, 972 F.2d 1145, 1155-56 (10th Cir. 1992).
Similarly, this court explained:  "If covered employees perform substantial duties during their
lunch breaks they must be paid . . . .  If they are relieved of substantial duties, they are following

---

[13]  Courts adopting the predominant-benefit standard have either rejected the complete-
relief standard as inconsistent with binding precedent or interpreted the meaning of "complete
relief" to be consistent with the predominant-benefit standard.  E.g., Reich v. S. New Eng.
Telecomms. Corp., 121 F.3d 58, 65 (2d Cir. 1997) (rejecting the complete-relief standard); Roy
v. Cty. of Lexington, 141 F.3d 533, 544 (4th Cir. 1998) (deeming the complete-relief standard
consistent with the predominant-benefit standard).

their own pursuits not the employer's, and this time [is not compensable]." <u>Aamold v. United States</u>, 39 Fed. Cl. 735, 740 (1997) (quoting <u>Agner v. United States</u>, 8 Cl. Ct. 635, 636 (1985)); <u>see also</u> <u>Baylor v. United States</u>, 198 Ct. Cl. 331, 365 (1972) (requiring compensation only when interruptions "substantially reduce" an employee's free time). Both formulations are instructive because they are rooted in the same guiding principle: compensability depends on who primarily benefits from the break. This determination, "[w]hether time is spent predominantly for the employer's benefit or for the employee's[,] is a question dependent upon all the circumstances of the case." <u>Armour & Co. v. Wantock</u>, 323 U.S. 126, 133 (1944).

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has yet to resolve the question of which party bears the burden of showing that the meal time predominantly benefits the employee or vice versa. <u>See</u> <u>Havrilla</u>, 125 Fed. Cl. at 464. Other circuits are split on the issue. <u>Id.</u> Some courts place the burden on the employer by reasoning that the meal period is an exemption from the FLSA and such exemptions are construed narrowly against the employer. <u>E.g.</u>, <u>Roy</u>, 141 F.3d at 540. Others, however, place the burden on the employee because seeking compensation for an unpaid meal period is no different than seeking compensation for periods of unpaid time, and the Supreme Court has definitively stated that employees bear the burden on the latter. <u>E.g.</u>, <u>Hertz v. Woodbury Cty., Iowa</u>, 566 F.3d 775, 783 (8th Cir. 2009). The United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") provides persuasive policy justifications for placing the burden on the employee:

> It is [the employees] who are in the best positions to prove that their actions during their scheduled mealtimes were for the benefit of the employer and thus not part of a bona fide meal period. To require that the [employer] prove a negative—that an employee was not performing "work" during a time reserved for meals—would perversely incentivize employers to keep closer tabs on employees during their off-duty time.

<u>Id.</u> at 784. Ultimately, however, the court does not need to determine which party has the burden of proof in this case. The undisputed facts establish that defendant is entitled to judgment as a matter of law regardless of who has the burden.

## B. The Parties' Arguments

The parties seek summary judgment on the same issues, which resulted in the court receiving multiple briefs containing the same (or substantially similar) arguments. In light of this duplication, the parties' arguments are presented below without reference to the particular filing in which the argument was made.

Plaintiffs argue that their break time primarily benefits the PFPA because officers have significant duties and restrictions during their breaks. More specifically, plaintiffs assert that, during their breaks, they are (1) required to be vigilant, remain on duty, and stay at the Pentagon reservation; (2) precluded from conducting personal business or congregating with others; and (3) subjected to frequent interruptions such as answering radio calls, performing administrative tasks, and providing directions to visitors. Even when not actively performing a task during a

break, plaintiffs contend that their uniformed presence at the Pentagon reservation during breaks conveys a significant security benefit that flows to the PFPA.

Plaintiffs also argue that they perform non-de minimis work during breaks and the PFPA knows that plaintiffs are working during their breaks. As to the de minimis issue, plaintiffs contend that the inquiry must focus on all of the restrictions and duties—i.e., everything that occurs during the unpaid breaks—rather than the amount of time spent on specific tasks. With regard to the PFPA's knowledge, plaintiffs assert that the PFPA had actual or constructive knowledge that plaintiffs worked during breaks because the PFPA:

- monitored the officers through radio checks;

- imposed duties and restrictions applicable during breaks;

- received a grievance from the officers' union alleging that work occurs during breaks;

- learned of the officers' break activities because officers told their supervisors that they were unable to fully enjoy breaks; and

- possessed documentation (i.e., maintenance reports, training results, etc.) reflecting the officers' activities that could be cross checked against beat sheets showing break times.

Defendant argues that no compensation is warranted because plaintiffs remain the primary beneficiary of their break time despite the duties and restrictions applicable during breaks. Defendant states that other courts have declined to convert meal breaks into compensable time when employees, like plaintiffs in this case, had to carry a radio, remain on call, wear a uniform, respond to interruptions from the public, and stay on the employer's premises during the break. Additionally, defendant avers that plaintiffs have failed to show that substantial interruptions occur so frequently that plaintiffs cannot use one of the breaks as a bona fide meal break. Defendant also asserts that the security benefit the PFPA receives from plaintiffs being in uniform and at the Pentagon reservation is not dispositive. Specifically, defendant states that the special circumstances involved in law enforcement allow for an employee's time to be simultaneously used for the employer and employee's benefit—i.e., an inactive officer engaged in his or her own pursuit nonetheless provides security value for the employer.

Even if some work is performed during each break, defendant argues that compensation is not warranted because plaintiffs perform only de minimis work during breaks and the PFPA lacked actual or constructive knowledge of any work during breaks. Turning first to the de minimis issue, defendant asserts that plaintiffs' obligations to respond to radio calls or address public inquiries while on break are the type of minor and sporadic work that courts disregard. With regard to the PFPA's knowledge, defendant argues that the PFPA lacked knowledge that

plaintiffs were working because supervisors only sporadically see plaintiffs at the end of a shift, and supervisors do not know whether an officer responding to a call is on a bona fide meal break rather than another break.

## C.  Analysis

The court is tasked with determining whether the undisputed facts establish as a matter of law that plaintiffs' meal breaks are primarily for plaintiffs' or the PFPA's benefit.  See Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir. 2004) ("The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law."); Birdwell v. City of Gadsden, Ala., 970 F.2d 802, 808 (11th Cir. 1992) ("It is for the court to determine if a set of facts gives rise to liability [under the FLSA].").  Cognizant that this determination is ultimately premised on the totality of the circumstances, Armour, 323 U.S. at 133, the court begins by focusing on the effect of each duty and restriction before taking a more comprehensive view of the interplay between plaintiffs' obligations and other factors.

### 1.  Restrictions

#### a.  Uniform and Location

As an initial matter, plaintiffs are correct that the requirement to remain in uniform and at the Pentagon reservation during breaks provides a benefit to the PFPA.  The presence of uniformed officers, even if on break, acts as a deterrent to illicit activity and provides the PFPA with resources to draw on if there is an emergency.  See Haviland, 729 F. Supp. 2d at 1058-59 (acknowledging the benefits that officers provide even when they are on break).  Moreover, defendant acknowledges that the uniforms are required to foster a positive public perception and help make the officers easily identifiable.  Although these benefits generally accrue to the PFPA, officers also benefit from being easily identifiable to each other and the public.  A use of force without the visible imprimatur of state authority puts the officer at risk.  See, e.g., Young v. City of Providence, 301 F. Supp. 2d 163, 166 (D.R.I. 2004) (discussing a plainclothes officer who attempted to assist in apprehending a criminal but was shot by the police who mistakenly believed that the officer was a civilian attempting to shoot a police officer).

Although a benefit that accrues to the employer, the requirements to stay in uniform and at the workplace do not transform a noncompensable meal period into compensable time.  Courts have granted summary judgment to employers despite restrictions on clothing and location.  E.g., Avery, 24 F.3d at 1347 (granting summary judgment to the employer when officers had to, among other things, remain in uniform and stay at the work area); Hill v. United States, 751 F.2d 810, 811, 815 (6th Cir. 1984) (similar); Agner, 8 Cl. Ct. at 636 (similar).  Moreover, the DOL has issued at least one opinion letter reflecting the department's position that uniform requirements do not render a meal period compensable.  Letter of Susan R. Meisinger, Deputy Under Secretary, U.S. Dep't of Labor, 1985 WL 304328, at *9 (July 29, 1985).  Although the DOL's positions are not binding, the department's advice "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Skidmore, 323 U.S. at 138.  Here, the DOL's opinion is persuasive given its consistency with judicial

precedent, and the DOL's position reinforces the court's conclusion that the uniform and location restrictions are insufficient on their own to transform a meal break into compensable time.

Moreover, law enforcement officers have a unique job that allows them to enjoy their breaks while simultaneously providing a benefit to their employer.  Generally, the benefits of an employee's time can be allocated to either the employee or the employer—not both—because an employee engaged in activities for the employer cannot pursue private interests at the same time. But law enforcement is different because the mere presence of a uniformed officer conveys a benefit to the employer.  Indeed,

> [w]hen [officers] perform passive duties, there is an overlap between their ability to pursue their own purely private interests and their ability to perform a service for [the employer].  [Officers] performing passive duties can have their own personal needs met and also simultaneously meet some of [the employer's] needs, simply by eating their lunch [at the employer's] facility rather than going offsite.  In contrast with most jobs, there is no 'either/or' tradeoff in which one party's gain is the other's loss.

Haviland, 729 F. Supp. 2d at 1058-59.  Here, the uniform and location requirements are passive requirements that provide a security benefit to the PFPA without impeding plaintiffs' ability to enjoy their breaks.  Plaintiffs remain free to move throughout the Pentagon reservation—a large workplace with various amenities and private spaces—and the uniform does not preclude plaintiffs from pursuing activities for their own benefit.  Ultimately, the restrictions provide no meaningful impediment to plaintiffs' full enjoyment of their breaks.

Plaintiffs unpersuasively argue that the uniform and location restrictions make the breaks compensable by drawing on case law involving more significant restrictions.  Plaintiffs primarily rely on two cases—Havrilla and Reich—where the requirement to stay at the job site supported judgment for the plaintiffs.  But both cases are distinguishable.  Havrilla and Reich involved significantly tighter restrictions on where the employees could go during their breaks; the employees had to stay in the immediate vicinity of their post.  Indeed, the employer in Havrilla required employees to "remain in or within sight of" the room where they performed their job, 125 Fed. Cl. at 459, and the employer in Reich similarly required employees to stay in the immediate vicinity of that day's construction site, 121 F.3d at 62.  In contrast to the employees in Havrilla and Reich, plaintiffs can move away from their duty post; they are bounded only by the sprawl of the Pentagon reservation.  This freedom distinguishes plaintiffs' restrictions from those placed on the employees in Havrilla and Reich.

### b.  Public Perception

Next, plaintiffs' ability to enjoy their breaks is immaterially limited by the requirement that they conduct themselves professionally during breaks.  Officers must take care to avoid activities that would lead the public to form negative perceptions, which limits their ability to congregate in public and precludes them from spending time in public playing video games,

watching YouTube videos, or getting their shoes shined. These limitations, however, are slight and inconsequential for two reasons. First, plaintiffs still have the freedom to engage in other activities in public. For example, plaintiffs may use their breaks to buy food at the Pentagon reservation's restaurants,[14] or, time permitting, use other amenities located at the Pentagon reservation. Second, the restrictions do not preclude activities but rather affect where they may be done. An activity that cannot be performed in public may still be done in any of the private spaces available to the officers.[15] Although this restriction may pose an inconvenience, the effect on plaintiffs' enjoyment of their breaks is small given the narrow range of activities the parties identified as falling under the ambit of the restriction. In sum, the requirement that plaintiffs refrain from performing certain activities in a public space imposes nothing more than slight limitations on plaintiffs' ability to enjoy their breaks.

## 2.  Duties

### a.  On Duty Versus On Call

Before turning to the analysis of the specific duties, the court first addresses whether plaintiffs remain on call, on duty, or on some variation thereof because plaintiffs have made duty status a central part of their argument. Plaintiffs are adamant that they remain on duty during breaks, and there is support for this position in the record. For example, Chief Kusse testified on behalf of defendant that he does not "believe that there's ever a period that [officers] would be completely relieved of duty or off-duty during [a shift]." Pls.' Mot. App. 104 (Kusse Dep. 102:11-13). But the record also indicates that plaintiffs are not on duty and are actually on call (or an otherwise less demanding status) during their breaks. Indeed, Director Steven Calvery noted in a Director's Feedback Line that officers on meal breaks "are in an on-call status" and may be "called to duty." Def.'s Mot. App. 31; accord id. at 2 (Plummer Decl. ¶ 13) ("Police officers are subject to call and required to be ready to report back to duty during their meal breaks . . . ."). This conceptualization of plaintiffs' status is also reflected in PFPA instructions explaining that officers on break "must be ready to resume duty status . . . ." Def.' Reply App. 91 (PFPA Operations Division Instruction Number 6) (emphasis added). Even without the

---

[14] Although the parties agree that plaintiffs can buy food from Pentagon reservation restaurants, the court cannot discern whether plaintiffs can or cannot eat in public. Compare Pls.' Resp. App. 71 (Allen Dep. 76:13-15) (testifying that officers must eat in the breakrooms), with id. at 71 (Allen Dep. 77:19-21) (agreeing that officers "are permitted to eat at" any restaurant on the Pentagon reservation); and id. at 887 (Bell Dep. 34:18-20) (explaining that previous testimony regarding not being allowed to eat in public only referred to when the officer was at his post). Nonetheless, any dispute regarding where plaintiffs can eat is ultimately immaterial.

[15] Although plaintiffs argue that the restrictions preclude them from taking care of any personal business during breaks, the record does not support such a sweeping statement. Other than receiving a shoe shine, the parties have not directed the court to any activity that cannot be performed either in public or private spaces.

-20-

conflicting evidence, the issue is further muddled by Chief Kusse's testimony suggesting that there is no distinction between on call and on duty:

> [Attorney]:  On-call - does, [o]n-call, necessarily mean – would mean that I'm still on-duty?
>
> . . . .
>
> [Chief Kusse]:  I believe it - yes, it does.

Pls.' Mot. App. 137 (Kusse Dep. 135:17-20).  Compounding the confusion, Chief Kusse suggested that there are different types of on-duty status: "So you're on duty from call until relieved of post . . . .  But there[ are] categories of that duty period."  Id. at 115 (Kusse Dep. 113:20-22).  But the semantics debate regarding the specific term used to define the duty status is immaterial because the parties have delineated plaintiffs' responsibilities while on and off break.  Focusing on the responsibilities rather than terms used to summarize those responsibilities is more in accord with the requirement to evaluate the totality of the circumstances.  See Armour, 323 U.S. at 133.  Accordingly, the court will analyze plaintiffs' actual obligations rather than the terminology used to describe plaintiffs' duty status.

### b.  Security

By remaining on a duty status throughout an entire shift, plaintiffs are inevitably required to devote some attention during their breaks to security-related responsibilities.  Although the precise nomenclature for plaintiffs' status during breaks remains unclear, the duties are not: plaintiffs must be vigilant, respond to emergency radio calls, answer questions from the public, and respond to radio checks (although the radio checks were recently discontinued).  These responsibilities provide a security benefit to the PFPA, and require plaintiffs to devote at least some time during breaks to official duties rather than personal pursuits.  As will be discussed below, the obligations do not meaningfully inhibit plaintiffs' enjoyment of their breaks.

First, plaintiffs are required to remain vigilant throughout their shifts regardless of whether they are on a break.  The persistence of a duty throughout an employee's shift (including break time) weighs in favor of compensability.  See Glenn L. Martin Neb. Co. v. Culkin, 197 F.2d 981, 984-85 (8th Cir. 1952).  Thus, the vigilance requirement would seem to weigh in favor of concluding that the breaks are compensable.  But this consideration is tempered by plaintiffs' ability to engage in other tasks while remaining vigilant.  See Ruffin v. MotorCity Casino, 775 F.3d 807, 812 (6th Cir. 2015) (explaining that compensation is not warranted when a job requirement does not preclude employees from using their breaks for other purposes).  Plaintiffs have provided various examples of tasks they perform on break (e.g., completing paperwork, finishing training courses, etc.) despite the requirement to remain vigilant.  The ability to do other tasks reflects that being vigilant does not preclude plaintiffs from using break time for other purposes, including the pursuit of personal activities.

The requirement that plaintiffs answer questions from the public shares similar qualities with the vigilance requirement because they are both duties that carry over into a break.

Plaintiffs must answer questions regardless of whether they are on or off break.  Ordinarily, this would indicate the responsibility weighs in favor of compensability.  See Culkin, 197 F.2d at 984-85.  But there are critical differences between the two duties that tilt the scale.  First, plaintiffs can avoid, or effectively nullify, the duty to answer questions by moving to a private area.  If plaintiffs spend their time in a breakroom, then this obligation only nominally persists because plaintiffs will not encounter members of the public.  Second, the interactions—often providing directions—can be so short that they do not preclude plaintiffs from using their time as they see fit.  See Naylor v. Securiguard, Inc., 801 F.3d 501, 505 (5th Cir. 2015) (noting that a two-minute interruption of a break was incidental and does not change the noncompensable nature of the break).

In addition, plaintiffs' obligations to carry a radio and remain in a state of readiness so that they can respond to emergency calls do not preclude plaintiffs from being the primary beneficiary of their break time.  First, the requirements provide a mutual benefit; the policy protects "[plaintiffs'] own safety as well as the safety of the public as well as national security."  Pls.' Mot. App. 143 (Kusse Dep. 141:5-7).  Indeed, "[i]t is a fair inference that radios enhance employees' freedom during their lunch break" because keeping a radio is "less [onerous] than requiring [employees] to stay within voice range of supervisors so they can be summoned if necessary."  Agner, 8 Cl. Ct. at 638.  Second, the requirements do not preclude plaintiffs from spending break time primarily on personal pursuits.  See, e.g., id. ("The mere fact that an employee is required to . . . be on a duty status, subject to emergency call during such period, does not convert his private leisure time into compensable time."); Haviland, 729 F. Supp. 2d at 1061 ("Numerous courts . . . have declined to find that an employer's requirement that an employee carry a radio and respond if necessary converts the meal time to work time.").  Indeed, the noted duties are generally passive; plaintiffs can (and do) perform other tasks during their breaks while listening for the radio and remaining ready to respond.  Therefore, the persistence of these duties throughout break time does not support concluding that plaintiffs must be compensated for their meal break.  See Ruffin, 775 F.3d at 812.  The record reflects that plaintiffs can and do multitask; as noted above, plaintiffs have identified other duties they perform during their breaks that they perform while still listening to their radios and remaining ready to respond if called.

The recently discontinued radio-check requirement also does not support plaintiffs' claim. The hourly radio checks involved plaintiffs listening for their names and responding with their location when called.  There is no meaningful difference between that responsibility and the requirement to listen for emergency calls; in both instances, the obligation is generally passive and leaves plaintiffs free to engage in other activities.  The radio checks also do not impose any meaningful burden on plaintiffs' freedom; indeed, at least one plaintiff did not even recognize that the checks had stopped.  Even if plaintiffs were burdened by the radio checks, testimony from plaintiffs and defendant reflect that the checks were done in part for plaintiffs' benefit.

### c. Administrative

The court next addresses plaintiffs' administrative responsibilities. These obligations fall into three different categories: (1) training, (2) paperwork, and (3) vehicle maintenance.

With respect to training, the occasional use of some break time to complete training courses poses an insignificant burden on plaintiffs' freedom. First, plaintiffs can use nonbreak time to complete the required training courses. Although plaintiffs are unable to do so when stationed at a busy post or a post without a computer, plaintiffs rotate posts so they will spend at least some time at a nonbusy post with a computer. Second, plaintiffs spend a short amount of time completing training courses; plaintiffs are only required to complete between eight and twenty courses per year with each course lasting between 20 and 180 minutes. This amount represents a small fraction of the time that plaintiffs are at the Pentagon reservation during a year.[16] Third, plaintiffs who must spend time completing training courses during a break can do so during a compensable break because they receive two or three breaks per shift. Plaintiffs can choose which break they use for a training course because they receive advance notice (up to one year) of due dates and can pause the course to resume at a later break of their choosing. Simply stated, plaintiffs have ample time to complete the mandatory training during a compensated period.

Turning next to paperwork, plaintiffs are not meaningfully burdened by requirements to write reports, check their email, file time sheets, or complete personnel documents. Plaintiffs' obligation to complete reports during breaks does not pose a significant burden on the use of their break time. Although plaintiffs may have to work on a report during a break multiple times per week, plaintiffs spend only a short amount of time writing a report on any given day. Indeed, Officer Cousins provided the only evidence regarding how many reports officers write when he testified that he prepared thirty-three reports over a multiyear period. Even if each report took the maximum forty-five minutes, the total amount of time is insignificant.

In addition to the reports, plaintiffs have other paperwork requirements that occupies some of their break time. The requirement that plaintiffs check their email twice per shift has no material effect on plaintiffs' ability to enjoy their meal break. Similar to the training discussed above, the email requirement does not support compensating plaintiffs for their meal breaks because they can check their email at certain posts—i.e., while not on break. Indeed, plaintiffs averred that they were not required to use break time to check their email every day. But even

---

[16] Plaintiffs have declared that on multiple days per week (or more) they spend at least some of their meal break reviewing and studying training materials. Pls.' Mot. App. 214 (Pls.' Decl. ¶¶ 1-2). Although plaintiffs do not declare how much time they spend on training each day, id., the amount must be small because the most plaintiffs-friendly estimates of the number and length of training courses shows at most sixty hours of training per year, Pls.' Resp. App. 489 (Cousins Dep. 34:16-20) (providing a high-end estimate of twenty-training courses per year); id. at 447 (Clute Dep. 23:3-10) (providing a high-end estimate of 180 minutes for the longest training). Otherwise stated, officers spent no more than a little over an hour per week on training.

when plaintiffs are unable to check their email at a post, the obligation places a very small burden on plaintiffs' ability to enjoy their break time and can be done during one of the compensable breaks.  With regard to the time sheets, plaintiffs arguably receive the primary benefit from the time spent documenting their hours worked:  they get paid.  Even if the PFPA was the primary beneficiary, the burden on plaintiffs' freedom is slight:  plaintiffs spend ten to fifteen minutes every two weeks validating a time sheet.  Also weighing against compensability is the fact that plaintiffs are not required to use break time (let alone the meal break) to fill out a time card because, at least occasionally, that task can be done while serving at a post with a computer.  Plaintiffs' obligation to complete personnel paperwork is also for their own benefit:  the evaluations form the basis for their bonuses.  But even if the PFPA is the primary beneficiary, plaintiffs face no meaningful limitation on their freedom because the task is infrequent (monthly or quarterly) and short (a few minutes).

With regard to the third category of administrative tasks, the requirements to refuel and inspect vehicles do not impose meaningful restrictions on plaintiffs' ability to enjoy their meal break.  The responsibilities only apply to a subset of plaintiffs on any given day; plaintiffs who are either stationed with a vehicle or provided one for a break are the only officers with such duties.  Moreover, plaintiffs assigned a vehicle are only required to devote a small amount of time—five minutes—to the lone regular task:  inspections.  This time is inconsequential given that plaintiffs receive at least thirty-five minutes for each of their two or three daily breaks, and "[o]rdinarily thirty minutes . . . is long enough for a bona fide meal period."  29 C.F.R. § 785.19.  The obligation to refuel a vehicle, a responsibility that does not arise on every shift, weighs more in plaintiffs' favor because the task takes longer.  But this factor is mitigated by plaintiffs' abilities to refuel the vehicle while not on break and choose any break to get fuel (thus leaving a meal break available).  Furthermore, plaintiffs receive a significant benefit from the refueling trip:  some use the trip to pick up food outside of the Pentagon reservation—an option that is otherwise unavailable to officers.

### 3.   Totality of the Circumstances

The above discussion addressing the effects of the individual restrictions and duties informs the court's analysis of who primarily benefits from the break time based on the totality of the circumstances.  The court begins with an overview of its totality-of-the-circumstances analysis before discussing several factors that bolster the court's conclusion.

### a.   Overview

Plaintiffs remain the primary beneficiary of their break time despite their ongoing duties and restrictions.  During breaks, plaintiffs can avail themselves of many of the Pentagon reservation's various public amenities or pursue their own interests in an employer-provided secluded space.  They are subject only to limited, inconsequential restrictions and infrequent interruptions, with the latter being the product of a small number of active duties and some nonburdensome passive duties.  These limitations do not substantially reduce plaintiffs' free time, and therefore do not transform the breaks into compensable time.  See Baylor, 198 Ct. Cl. at 365.  Even if plaintiffs' duties and restrictions precluded plaintiffs from being the primary beneficiary of one of their breaks each shift, plaintiffs are not so limited on every break during a

shift. See infra Section IV.C.3b.iii (discussing the relationship between the restrictions, interruptions, and break policy). Simply stated, plaintiffs receive a bona fide meal break each work day. See Aamold, 39 Fed. Cl. at 741 (explaining that compensation is not required when an interrupted meal time can be taken at another time during a shift). Accordingly, defendant is entitled to summary judgment on this issue.

Plaintiffs resist this conclusion by arguing that they are entitled to summary judgment because employees prevailed under purportedly similar facts in Glenn L. Martin Nebraska Co. v. Culkin, Alexander v. City of Chicago, and Lamon v. City of Shawnee. As explained below, these decisions are not helpful to plaintiffs.

In Culkin, the employees were security guards on a military base who were required to spend their entire shift "maintaining order and exercising constant vigilance for the security of the plant." 197 F.2d at 983. Employees also had duties related to their post, but those did not carry over when the employees left their post during breaks. Id. The Eighth Circuit held that the breaks were compensable because "[the employees] were performing their regular duties during that period and were substantially performing the duties assigned to them by their employer and were not free to follow pursuits of a purely private nature." Id. at 984. Although the employees were rarely interrupted during their breaks, the court reasoned that the employees were performing their regular duties during breaks because they "served to a considerable extent in a stand-by capacity" such that they "were engaged in their regular duties during the 30-minute period as effectively as if they were putting down disturbances." Id. at 985.

Culkin is distinguishable from the case currently before the court. First, plaintiffs do not primarily serve in a stand-by capacity. Their duties require active engagement while at a post; plaintiffs are directing traffic, checking bags, driving around the base, and other nonpassive tasks. In contrast, Culkin involved employees that, as the court recognized, spent much of their time waiting to respond to disturbances. See id. at 984-85. Second, plaintiffs are not performing essentially the same responsibilities on and off break. See infra Section IV.C.3.b.i. In contrast, the employees in Culkin performed their primary responsibility throughout their entire shift. Culkin v. Glenn L. Martin Neb. Co., 97 F. Supp. 661, 669 (D. Neb. 1951) ("The primary function of a guard, irrespective of his particular station at the plant, involved constant vigilance . . . .").[17]

Alexander is also not instructive here because the decision was premised on the lack of factual development rather than on the merits. See 994 F.2d at 337. In Alexander, the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") reversed the district court's decision granting the employer's motion for judgment on the pleadings. Id. at 340. The Seventh Circuit explained that judgment on the pleadings was inappropriate because resolving the case requirds "sufficient development of the facts." Id. at 339; see also id. at 337 ("No case that we are aware of involving law enforcement personnel treats compensability as a matter for judgment

---

[17] The district court's recitation of the facts is helpful because the Eighth Circuit did "not deem it necessary or desirable to relate in detail the facts describing the exact nature of the duties." Culkin, 197 F.2d at 984.

on the pleadings."). Simply stated, <u>Alexander</u> did not hold that the employees in that case were entitled to a compensable meal break based on the duties and restrictions in effect.

Finally, <u>Lamon</u> is not helpful to plaintiffs. <u>Lamon</u> involved police officers who could not conduct personal errands during a break but were required to spend that time acting professionally, being available by radio, responding to emergency calls, answering citizen requests, staying within the city limits, and confronting crimes committed in the officer's presence. 972 F.2d at 1156. The relevant issue on appeal was the trial court's denial of the employer's motion for a directed verdict—i.e., whether there was sufficient evidence for the jury to find for the employees. <u>Id.</u> at 1155. After restating the facts noted above, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") declined to "find the evidence points but one way" and explained that the "number and range of restrictions" was sufficient for a jury to return a verdict for the employees. <u>Id.</u> at 1156.

<u>Lamon</u> neither supports granting summary judgment for plaintiffs nor counsels against deciding in favor of defendant. Plaintiffs' argument that their breaks are compensable as a matter of law is not assisted by <u>Lamon</u> because the Tenth Circuit merely held that, under the specific facts present in that case, compensation may be available and is to be determined by the fact finder. <u>See id.</u> One may surmise that <u>Lamon</u>'s holding counsels against granting summary judgment for either party, but such a conclusion is not mandated because the two cases have meaningful factual differences. Unlike the officers in <u>Lamon</u>, plaintiffs in this case have multiple breaks they can use for a meal break if one is interrupted. Additionally, the Tenth Circuit did not know (or did not address) how often employees were interrupted, while the parties here have developed those facts. Both facts are significant considerations in the instant case. <u>See infra</u> Section IV.C.3.iii.

Simply stated, the case law that plaintiffs rely on does not dissuade the court from concluding that plaintiffs receive a bona fide meal break during each shift.

### b. Factors

The court's conclusion that plaintiffs' meal breaks are not compensable is bolstered by four factors. First, plaintiffs perform different duties on break than during the rest of their shift. Second, plaintiffs are replaced with other employees during a break. Third, plaintiffs are subject to interruptions during breaks that are short and sufficiently infrequent. Fourth, the PFPA implemented a system allowing plaintiffs to request compensation for any period during which they are unable to get a bona fide meal break. The court addresses each factor in turn.

### i. Different Duties

First, the fact that plaintiffs perform different duties when on break compared to when they are off break suggests that defendant is entitled to summary judgment. The focus on what duties carry over to breaks is important because "[employees] are not free to engage in personal pursuits when . . . [they] are required to perform essentially the same duties that [they] perform for the rest of their shifts during their meal breaks." <u>Havrilla</u>, 125 Fed. Cl. at 465. When not on break, plaintiffs are assigned to a specific post that may require checking bags, traffic

management, or any assortment of policing tasks. Many of these duties are linked to a post such that plaintiffs do not (and in some cases, cannot) perform them when they leave for a break.[18] Certainly, plaintiffs have duties related to interacting with members of the public (such as answering questions or being vigilant) that are not tethered to a post; plaintiffs are responsible for these duties regardless of their break status. But there are significant differences in the nature of these responsibilities between officers who are on break and officers who are off break: plaintiffs at their post cannot avoid members of the public while plaintiffs on break can (by going into one of the private areas). Plaintiffs on break, therefore, can effectively nullify any duty related to public interaction. In sum, plaintiffs do not have essentially the same duties when they are on and off break, which supports granting summary judgment for defendant.

### ii.  Staffing Practices

Second, the PFPA's staffing policy, which provides for officers to replace plaintiffs while they are on break, also weighs strongly in favor granting summary judgment to defendant. Courts reviewing the compensability of meal breaks look to whether, but for the restrictions or duties, the employer would have had to pay others to perform the same services. E.g., Ruffin, 775 F.3d at 814; Reich, 121 F.3d at 65. Indeed, the court in Havrilla found "it significant that if the [employer] did not [require various duties from on-break employees] the [employer] would have had to hire someone else to perform those duties." 125 Fed. Cl. at 465-66. Similarly, the United States Court of Appeals for the Second Circuit concluded in Reich that meal breaks were compensable when the employees continued to have responsibilities "and, in [the employees'] absence, the company would have to pay others to perform those same services." 121 F.3d at 65. Both courts expressed the same concern: holding the breaks noncompensable would effectively provide employers with unpaid labor. Id.; Havrilla, 125 Fed. Cl. at 466. Here, there is no such concern because plaintiffs are relieved from their post by "breakers"—employees tasked with rotating between posts while the person who is regularly stationed at a post takes a break. Moreover, there are additional significant differences between plaintiffs' employment situation and the employees' limitations in Reich and Havrilla.

Reich involved employees who worked outside installing communications equipment and were required to spend their unpaid lunch break "at the site to secure the area and its equipment and to prevent possible harm to the public." 121 F.3d at 62-63. Because of that requirement, the employees were required to spend their uncompensated lunch break "at or near the work site, often in the cab of a truck or near a manhole, trench, or telephone pole." Id. at 63. Plaintiffs' case is distinguishable because plaintiffs have the freedom to spend their break in a meaningfully different environment than the employees in Reich. See Haviland, 729 F. Supp. 2d at 1068 (distinguishing Reich because the employees there were restricted to a small area without many resources). Further, the employees in Reich were required to eat at (or very close to) their outdoor job site while plaintiffs have access to computers, breakrooms, and other resources at the Pentagon reservation. Therefore, plaintiffs are better positioned to use their break time to pursue their own interests.

---

[18] For example, an officer who is responsible for directing traffic cannot do so from the confines of a breakroom.

Havrilla involved United States Navy employees assigned to check weapons into and out from a storage room. 125 Fed. Cl. at 456-57. During their nominal meal break, the employees were required to stay in uniform, remain in (or within eyesight of) the room, and assist people who wanted to check in or out weapons. Id. Holding that such breaks required compensation, the court focused on the facts that employees remained confined to their post and performed substantially the same duties on break as they performed during the rest of their shift. Id. at 464-66. Those factors are not present here. First, plaintiffs are not limited to their post; they can go anywhere on the Pentagon reservation—a sprawling complex. Second, plaintiffs do not perform substantially the same tasks when on break. See supra Section IV.C.3.b.i.

### iii. Interruptions

Third, the timing and nature of the interruptions that occur during plaintiffs' breaks also weigh against holding that plaintiffs' meal breaks are compensable. Plaintiffs' breaks are interrupted by the security and administrative duties plaintiffs must perform. The essence of plaintiffs' argument is that these interruptions, when considered in conjunction with the restrictions, make defendant the primary beneficiary of plaintiffs' break time. Plaintiffs are mistaken. Because the restrictions in this case are either inconsequential or insufficient on their own to render a break compensable, see supra Section IV.C.1, the court gives significant weight to the nature and effect of the interruptions while remaining cognizant of the fact that the compensability analysis is premised on the totality of the circumstances.

Plaintiffs are subject to interruptions that are generally short or infrequent (and sometimes both).[19] Such interruptions do not support compensability. See Reimer v. Champion Healthcare Corp., 258 F.3d 720, 725 (8th Cir. 2001) (frequency); Naylor, 801 F.3d at 505 (length); see also 29 C.F.R. § 785.47 ("In recording working time under the [FLSA], insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical matter be precisely recorded for payroll purposes, may be disregarded."). Plaintiffs have identified various interruptions—such as providing directions, checking their email, inspecting a vehicle, or answering a radio check—that are short and difficult to capture. Other interruptions, such as completing training courses or refueling a vehicle, are longer but occur infrequently; plaintiffs aver that they have limited training requirements and sometimes do not need to refuel the car during a shift. The requirement to complete paperwork (e.g., time sheets or personnel documents) arises infrequently and is not time consuming; the task occurs biweekly at most and takes only a few minutes. Most telling, perhaps, is the fact that many plaintiffs admit that they had shifts during which they were never interrupted, while other plaintiffs testified that they had at least one uninterrupted break during a shift.

The PFPA's policy of providing multiple breaks per shift also weighs in defendant's favor. "[E]ven if plaintiffs' designated meal time was interrupted, they cannot recover overtime

---

[19] Plaintiffs may experience a longer interruption if they are called to an emergency. In those instances, plaintiffs can either use another break as the bona fide meal break or request compensation when another break is unavailable. Both options are discussed below.

compensation if they were allowed to take their meal period at another time during their eight-hour shift." Aamold, 39 Fed. Cl. at 741. Plaintiffs' shifts include two or three breaks—any of which can be used as the unpaid meal break—and plaintiffs generally are not interrupted during every break. Therefore, they maintain the freedom to use one of their breaks as a meal break.

### iv.  Payment System

The court also deems important the fact that the PFPA maintained a system for plaintiffs to request overtime compensation when they were unable to take a bona fide meal break. When evaluating meal breaks, courts have found persuasive the employer "ha[ving] in place a system, which all [employees] knew of, and which two of the three representative [employees] in fact used, to compensate [employees] for days when they were unable to get thirty minutes of interrupted meal time." Haviland, 729 F. Supp. 2d at 1072 (collecting cases for the proposition that such a system is consistent with the purposes of the FLSA). Here, there is no dispute that plaintiffs are aware of such a system and have not been denied overtime compensation when they request it.

Moreover, affording weight to the existence of a system to request overtime compensation makes sense in this case because the use of such a system allows the PFPA to pay plaintiffs only for compensable meal breaks and not, as plaintiffs request, for all meal breaks. The crux of plaintiffs' case is that occasional interruptions combine with persistent duties and restrictions to render all breaks compensable. Because only some meal breaks have an interruption that tilts the scale towards compensability, compensation is not warranted for every meal break. The existence of an overtime system that allows plaintiffs to request compensation for the instances when they are unable to enjoy a meal period provides a workable solution: plaintiffs get paid when sufficient interruptions make a meal break compensable, and the PFPA is not required to pay when there are insufficient interruptions.

In sum, the court is convinced that plaintiffs are the primary beneficiaries of their meal breaks such that the time spent on those breaks is not compensable. Having so concluded, the court does not need to engage in an analysis of damages. Accordingly, with request to the meal break claim, the court grants defendant's motion for summary judgment with respect to that and denies plaintiffs' motion for partial summary judgment on the same issue.

## V.  DONNING-AND-DOFFING CLAIM

In their second claim for relief, plaintiffs seek compensation for the pre- and postshift time they spend donning and doffing their standard uniforms. The parties both seek summary judgment on this issue.

### A.  Principal Activities Versus Preliminary or Postliminary Activities

Plaintiffs' donning-and-doffing claim turns on whether donning and doffing are considered principal activities or preliminary/postliminary activities because the FLSA, as amended by the Portal Act, requires compensation for the former but not the latter. See Alvarez,

546 U.S. at 27; see also 29 U.S.C. § 254(a) (excluding from FLSA liability "activities which are preliminary to or postliminary to [the employee's] principal activity or activities."); Alvarez, 546 U.S. at 25 (describing the relationship between the FLSA and the Portal Act). The Portal Act, however, does not preclude compensation for pre- and postshift activities because "the term 'principal activity or activities' . . . embraces all activities which are 'an integral and indispensable part of the principal activities.'" Steiner v. Mitchell, 350 U.S. 247, 252-53 (1956); see also 5 C.F.R. § 551.412 (discussing principal activities as well as preliminary and postliminary activities). Indeed, the Supreme Court explained that activities performed by an employee "before or after the regular work shift" that are "an integral and indispensable part of the principal activities" of the employee are themselves "principal activities" and, thus, are not excluded from FLSA coverage by the Portal Act. Steiner, 350 U.S. at 253.

When interpreting the terms "integral" and "indispensable," the Supreme Court has "used those terms in their ordinary sense." Busk, 135 S. Ct. at 517. "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id.; see also Whalen v. United States, 93 Fed. Cl. 579, 599 (2010) (noting that an activity is indispensable if it is closely related to an employee's principal work activities). Providing guidance on the integral-and-indispensable standard, the Federal Circuit explained that "[t]he more the preliminary (or postliminary) activity is undertaken for the employer's benefit . . . and the less choice the employee has in the matter, the more likely such work will be found to be compensable . . . ." Bobo, 136 F.3d at 1367 (quoting Reich v. N.Y. City Transit Auth., 45 F.3d 646, 650 (2d Cir. 1995)).

## B. The Parties' Arguments

Plaintiffs argue that they are entitled to compensation for the time spent donning and doffing the clothing and equipment that composes their standard uniform. They assert that compensation is warranted because donning and doffing are indispensable and integral to their principal activity. Defendant responds that the time plaintiffs spend donning and doffing their standard uniform is not integral to a principal activity (thus, not compensable) because officers can change at home. Plaintiffs counter that defendant's position is premised on a DOL memorandum, which courts have concluded lacks the force of law. Even if the memorandum is applicable, plaintiffs assert that the guidance only applies to clothing and does not address equipment.

## C. Analysis

The court must determine whether plaintiffs' donning and doffing of their standard uniforms is integral and indispensable to plaintiffs' principal activity or activities. For reasons discussed below, the court concludes that the donning-and-doffing process is indispensable to a principal activity and that genuine issues of material fact exist on whether the process is also integral to such an activity.

## 1. Indispensable

Turning first to whether the standard uniform is indispensable, the court agrees with plaintiffs that the standard uniform is indispensable to plaintiffs' principal activity—policing. As noted above, a duty is indispensable when it "cannot be dispensed with . . . if [the employee] is to perform his principal activities." Busk, 135 S. Ct. at 517. The undisputed facts in this case demonstrate that plaintiffs cannot perform their principal activity without wearing their standard uniform.[20] The PFPA made this point clear in the purpose section of the agency's uniform policy: "The quasi-military nature of policing and the need for visibility in the basic police function requires uniformity in appearance." Def..'s Mot. App. 16. Because donning and doffing the standard uniform is indispensable to the officers' principal activity, the right to be compensated for that time ultimately depends on whether changing into and out of the standard uniform is integral to the officers' principal activity.

## 2. Integral

The Federal Circuit has not addressed whether donning and doffing clothing (or equipment) is integral to a principal activity when an employee can dress and undress at home. Absent controlling precedent, the court reviews how other jurisdictions have treated relevant DOL guidance, explains why the DOL's interpretation is persuasive, and applies the DOL's framework to the facts of this case. Ultimately, the court concludes that summary judgment is not warranted for either party because there is a material factual dispute regarding whether plaintiffs have the meaningful ability to don and doff their standard uniform at home.

### a. Agency Guidance

The DOL has issued guidance that directly addresses whether the ability to don and doff at home precludes an activity from being integral to a principal activity.[21] Specifically, the DOL explained in a May 31, 2006 advisory memorandum:

> [D]onning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises. It is our longstanding position that if employees have the option and ability

---

[20] Notable (but not dispositive) is the fact that defendant does not argue that the standard uniform is indispensable but rather focuses on whether the standard uniform is integral to plaintiffs' principal activity.

[21] As noted above, the DOL's guidance is instructive even though this case technically falls under the purview of the OPM. See supra Section III.B.

to change into the required gear at home, changing into that gear is
not a principal activity, even when it takes place at the plant.

U.S. Dep't of Labor, Wage and Hour Div., Wage and Hour Advisory Memorandum No. 2006-2,
at 3 (May 31, 2006) [hereinafter DOL Memorandum].  This emphasis on the location of an
activity is also reflected in the DOL's regulations, which explain that an employee who "cannot
perform his principal activities without putting on certain clothes" is entitled to compensation for
the time spent "changing into clothes on the employer's premises at the beginning and end of the
workday" because that activity is "an integral part of the employee's principal duty." 29 C.F.R.
§ 790.8(c).  The DOL guidance, therefore, suggests that it is the DOL's position that the ability
to don and doff a uniform at home means that activity is not integral to a principal activity.

Outside of the Federal Circuit, courts have taken divergent approaches regarding the use
of the DOL's guidance to determine whether donning and doffing are integral to a principal
activity when employees have the option and ability to change clothes at home.  Lesane v.
Winter, 866 F. Supp. 2d 1, 5 (D.D.C. 2011).  Some courts have declined to follow the DOL
Memorandum for reasons that will be discussed below.  E.g., Anderson v. Perdue Farms, Inc.,
604 F. Supp. 2d 1339, 1354-56 (M.D. Ala. 2009); Rogers v. City and County of Denver, No. 07-
cv-00541-RPM, 2010 WL 1904516, at *4 (D. Colo. May 11, 2010).  But others have followed
(or adopted a position consistent with) the DOL's guidance.  DeKeyser v. Thyssenkrupp
Waupaca, Inc., 747 F. Supp. 2d 1043, 1053 (E.D. Wis. 2010) (noting that "[a] number of courts"
have adopted positions "consistent with the DOL's interpretation" and collecting cases from
different jurisdictions).  Before any federal appellate court had addressed the persuasiveness of
the DOL's position, some district courts focused on the location of the activity and "accept[ed]
the proposition, espoused by [the DOL], that the donning and doffing of protective gear at home
typically renders that activity non-compensable under the FLSA."  Martin v. City of Richmond,
504 F. Supp. 2d 766, 775 (N.D. Cal. 2007); accord Abbe v. City of San Diego, Nos. 05cv1629
DMS (JMA), 06cv0538 DMS (JMA), 2007 WL 4146696, at *5-6 (S.D. Cal. 2007) (collecting
cases); see also Haight v. The Wackenhut Corp., 692 F. Supp. 2d 339, 345 (S.D.N.Y. 2010)
(deeming "[m]ost significant[]" the fact that security officers "are not required to change on [the]
employer's premises and have the option of changing at home").  But see Lemmon v. City of
San Leandro, 538 F. Supp. 2d 1200 (N.D. Cal. 2007) (declining to follow the DOL
Memorandum because, at the time, the integral analysis of the United States Court of Appeals
for the Ninth Circuit's ("Ninth Circuit") did not depend on the location of the activity).  After
these decisions, the Ninth Circuit addressed the DOL's guidance and concluded that the DOL
Memorandum is persuasive because it is consistent with judicial precedent, prior DOL advice,
and congressional intent.  Bamonte v. City of Mesa, 598 F.3d 1217, 1228-31 (9th Cir. 2010).
Since the Ninth Circuit's decision in Bamonte, courts outside of the Ninth Circuit have also
focused on the location of the donning and doffing.  See, e.g., Musticchi v. City of Little Rock,
Ark., 734 F. Supp. 2d 621, 626 (E.D. Ark. 2010); Constant v. Webre, No. 07-3042, 2010 WL
2243641, at *3 (E.D. La. June 1, 2010).

### b.  **Skidmore** Deference

Agency interpretations lacking the force of law are entitled to deference "only to the
extent those interpretations have the 'power to persuade.'"  Christensen v. Harris Cty., 529 U.S.

576, 587 (2000) (quoting <u>Skidmore</u>, 323 U.S. at 140). This limited reliance is commonly known as <u>Skidmore</u> deference and is appropriate when considering "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law." <u>Id.</u> When determining whether to afford <u>Skidmore</u> deference to an agency's interpretation, the court considers "the thoroughness evident in [the interpretation's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." <u>Skidmore</u>, 323 U.S. at 140; <u>see also</u> <u>United States v. Mead</u>, 533 U.S. 218, 235 (2001) ("[An agency's interpretation] may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight."). <u>Skidmore</u> deference is often contrasted with <u>Chevron</u> deference, which applies to formal rulemaking (or similar situations) and requires deference to reasonable, authorized agency interpretations of statutes when the meaning of those statutes is ambiguous. <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-44 (1984).

This court agrees with those courts that have concluded that the DOL Memorandum is entitled to <u>Skidmore</u> deference. As with the DOL's interpretative regulations concerning the FLSA, the DOL Memorandum does not have the force of law but is entitled to respect to the extent the memorandum has the power to persuade. <u>Skidmore</u>, 323 U.S. at 140; <u>see also</u> <u>Bamonte</u>, 598 F.3d at 1228 & n.10 (applying <u>Skidmore</u> dereference to the DOL Memorandum after explaining that <u>Chevron</u> deference was not warranted). In this case, the DOL Memorandum is persuasive because of its consistency with judicial precedent, congressional intent, and prior DOL's interpretations.

First, the DOL's emphasis on the location of the donning and doffing in the DOL memorandum is consistent with binding judicial precedent. The Supreme Court's decisions in both <u>Steiner</u> and <u>Alvarez</u> involved employees who were entitled to compensation when they were required to don and doff their uniforms and equipment at the workplace. <u>See</u> <u>Steiner</u>, 350 U.S. at 256; <u>Alvarez</u>, 546 U.S. at 39; <u>see also</u> <u>Bishop v. United States</u>, 72 Fed. Cl. 766, 780 (2006) (noting that the Supreme Court in <u>Alvarez</u> was not asked to reevaluate the Ninth Circuit's holding that time donning and doffing at the employer's premise was a principal activity but endorsed that decision). Similarly, the United States Court of Claims held that donning and doffing a uniform was integral and indispensable to the principal activity when the uniforms "were government owned and could not be worn to or from the guard's home . . . ." <u>Baylor</u>, 198 Ct. Cl. at 338. Moreover, the Federal Circuit and the DOL Memorandum both articulate the same principle: an activity is more likely to be a principal activity when the employee has less choice in the matter. <u>See</u> <u>Bobo</u>, 136 F.3d at 1367; DOL Memorandum 3.

Second, the DOL's position is consistent with Congress's purpose for enacting the Portal Act. In the Portal Act, Congress provided findings explaining that the law was a reaction to judicial interpretations of the FLSA "creating wholly unexpected liabilities" that would have a negative effect on employers, employees, and others. 29 U.S.C. § 251. Aligning with the purpose of avoiding unexpected costs, the DOL Memorandum provides predictability for employers and employees regarding when the time spent donning and doffing is compensable.

Third, the guidance in the DOL memorandum is consistent with the DOL's prior interpretations.  The DOL has focused on the location of the donning and doffing since the passage of the Portal Act.  A November 1947 bulletin advised that time spent changing into protective clothing is compensable when the task is performed at the worksite.  29 C.F.R. § 785.24(c) (documenting 1947 bulletin).  Then, in a September 11, 1968 opinion letter, the DOL advised that "employees who elect to dress at home before going to work are not working while dressing even though the uniform they put on at home is required to be worn in the place of their employment during working hours."  U.S. Dep't of Labor, Opinion Letter No. 908 (Sept. 11, 1968).  Similarly, the DOL advised, in a January 28, 1974 opinion letter, that donning and doffing time is compensable when the employer's rules required uniformed employees to "change clothes on the premises at the beginning and end of their work shifts."  U.S. Dep't of Labor, Wage and Hour Div., Opinion Letter (Jan. 28, 1974).  The 1996 version (and potentially earlier iterations) of the DOL's Wage and Hour Division's Field Operations Handbook also focused on the location of the activity:  "Employees who dress to go to work in the morning are not working while dressing even though the uniforms they put on at home are required to be used in the plant during working hours."  U.S. Dep't of Labor, Wage and Hour Div., Field Operations Handbook § 31b13 (2017), available at https://www.dol.gov/whd/FOH/index.htm [https://perma.cc/TNS3-CGGY] (noting that the last revision to § 31b13 occurred in September 1996).

The preceding analysis suggests that the DOL Memorandum is persuasive, but plaintiffs argue that is not the case because the DOL's guidance does not have the force of law.  Although the memorandum does not have the force of law, the court is not precluded from considering the guidance when it is persuasive.  See Skidmore, 323 U.S. at 140.  Moreover, the two decisions plaintiffs cite in which courts declined to follow the DOL guidance do not change the court's conclusion that the DOL Memorandum warrants Skidmore deference.  First, the court in Anderson v. Perdue Farms, Inc., did not follow the DOL's position because it conflicted with binding precedent in the Eighth Circuit, 604 F. Supp. 2d at 1354-55—a circumstance that is not present here.  Second, the court in Rogers v. City & Cty. of Denver provided no explanation regarding why it concluded that the DOL Memorandum was not persuasive.  2010 WL 1904516, at *4.  The decision in Rogers, therefore, does not meaningfully bolster plaintiffs' argument that the DOL's guidance should be disregarded.  Cf. Skidmore, 323 U.S. at 140 (explaining that the persuasive power of nonbinding agency guidance should consider the thoroughness and validity of the analysis).

Even if the DOL Memorandum is persuasive, plaintiffs argue that the DOL's guidance is limited to clothing and does not address time spent donning and doffing equipment.  Plaintiffs assert that such a limited interpretation of the memorandum was adopted in Lesane v. Winter and Martin v. City of Richmond, two district court cases.  The court is not persuaded.  In Martin, the court did not interpret the DOL Memorandum as limited to clothing but rather "accept[ed] the proposition, espoused by the [DOL], that donning and doffing of protective gear at home typically renders that activity non-compensable under the FLSA."  504 F. Supp. 2d at 775 (emphasis added).  In contrast, the court in Lesane adopted a limited view of the DOL Memorandum but did so based on an incorrect reading of the memorandum.  The Lesane decision states that gear is not covered by the memorandum because it "refer[s] to 'clothes,' and

items like pepper mace and flashlights [i.e., gear] do not fall within the plain meaning of 'clothes.'"  866 F. Supp. 2d at 6.  But the DOL Memorandum is not limited to clothes; contrary to the premise of <u>Lesane</u>, the DOL memorandum explicitly refers to gear and advises that time spent donning or doffing "the required <u>gear</u> at home" is not compensable.  DOL Memorandum 3 (emphasis added).

In sum, the court concludes that the DOL Memorandum is entitled to <u>Skidmore</u> deference, and plaintiffs' arguments to the contrary are not persuasive.  The court will look to the framework set forth in the DOL Memorandum to analyze whether plaintiffs' donning and doffing are integral to a principal activity.

### c. Factual Dispute

Pursuant to the DOL guidance, employers are not required to pay employees for the time they spend donning and doffing when the employees "genuinely have the 'option and ability' to change . . . at home."  <u>Lesane</u>, 866 F. Supp. 2d at 6; <u>accord</u> DOL Memorandum 3 ("[I]f employees have the option and ability to change into the required gear at home, [then] changing into that gear is not a principal activity . . . .").  It is not enough that the law and the employer permit employees to change at home.  <u>See</u> 29 C.F.R. § 790.8(c) n.65 (explaining that donning and doffing are integral to a principal activity when "the changing of clothes on the employer's premises is required by law, rules of the employer, <u>or the nature of the work</u>" (emphasis added)).  The court must also consider whether the employees are in effect constrained to changing at work because of the nature of the job.  <u>Id.</u>; <u>accord</u> <u>Martin</u>, 504 F. Supp. 2d at 776 (denying summary judgment when the employer permitted police officers to change at home but the officers expressed safety and security concerns regarding changing at home).

In light of the standard articulated above, the record reflects a factual dispute regarding whether plaintiffs have a meaningful ability to don and doff at home.  Plaintiffs testified to a variety of reasons for why officers don and doff at their chosen location, either home or work (or both).  One plaintiff said he changed at home because it was convenient.  The reasoning for those who change at work is mixed; some said they did so for convenience, others raised personal and safety concerns, and one said he did so due to safety considerations.  And somewhere in the middle of these two groups are the three plaintiffs who change both at home and at work but provided no clear rationale for their decision.  Taken together, these averments reflect a variety of approaches to the donning and doffing requirement with equally diverse rationales.  Indeed, the conflict over whether plaintiffs have the meaningful ability to change at home is most clearly expressed by Officer Cousins's testimony suggesting that most officers change at home because they have a long commute, and Officer Bradley's testimony that the PFPA advised officers to leave their uniform at work for safety reasons.  A fact finder weighing these statements, especially in light of the other evidence in the record, could rule for either plaintiffs or defendant.  Thus, the court concludes that summary judgment on the donning-and-doffing claim is not warranted for either party.

## VI.  CONCLUSION

Because plaintiffs receive the predominant benefit from their meal break, defendant is entitled to summary judgment with respect to the meal break claim. As to the donning-and-doffing claim, neither party is entitled to summary judgment because there is a genuine issue of material fact regarding whether plaintiffs have a meaningful ability to don and doff at home. Therefore, the court **GRANTS IN PART** (with respect to the meal break claim) and denies in part (with respect to all other aspects) defendant's motion for summary judgment.  The court also **DENIES** plaintiffs' motion for partial summary judgment in its entirety.

By **no later than Friday, July 13, 2018,** the parties shall file a joint status report suggesting further proceedings in this case.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
