# In the United States Court of Federal Claims

No. 15-732C
(Filed: December 19, 2019)

*************************************
TEJERE J. AKPENEYE et al.,

        Plaintiffs,

v.

THE UNITED STATES,

        Defendant.
*************************************

Trial; Fair Labor Standards Act; Portal-to-Portal Act; Donning and Doffing; Overtime; Police Officers

Stephen G. DeNigris, Albany, NY, for plaintiffs.

Rebecca S. Kruser, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

    Current and former Pentagon Force Protection Agency ("PFPA") officers filed the instant lawsuit in which they allege that they are entitled to compensation for their meal-break periods and the time they take to don and doff their uniforms and equipment. They seek to recover unpaid overtime pay and other damages pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219 (2012), as amended by the Portal-to-Portal Act of 1947 ("Portal Act"), id. §§ 251-262. The court held a trial on the donning-and-doffing claim asserted by fifteen sample plaintiffs and received posttrial briefing from the parties. In light of the facts established during the trial, the court concludes that plaintiffs have not established a FLSA violation.

### I. Procedural History

    A group of current and former PFPA officers, on behalf of themselves and similarly situated employees, filed a complaint that they styled as an FLSA collective action. They then filed an amended complaint in which they assert two claims. Both claims are premised on the PFPA allegedly violating the FLSA by failing to pay officers for all the time they worked. In the first claim, the officers allege that they are entitled to compensation under the FLSA for their meal breaks. For the second claim, the officers allege that they must be compensated under the FLSA for the time they spend donning and doffing their uniforms and equipment. To remedy those alleged FLSA violations, the officers request that the court (1) allow the case to proceed as a collective action; (2) order an accounting of the officers' lost wages; (3) enjoin the PFPA from

continuing to commit the alleged unlawful practices; and (4) order the payment of unpaid overtime, liquidated damages, and statutory penalties, as well as costs, interest, and attorney's fees.

After defendant filed its answer, the court accepted the parties' proposal to bifurcate the litigation.  The first phase would involve the parties selecting sample plaintiffs and litigating those officers' claims.  During the second phase, the court would determine whether the sample plaintiffs are representative of the remaining officers such that the decision reached during the first stage should be applied to the officers whose claims were not adjudicated during that stage.

The parties subsequently selected twenty sample plaintiffs:  Tejere Akpeneye; Jonathan Allen; Sahr Alphaek; Jacque Alston; Wayne Antoine; Carl Aslaksen; Michael Baker; Christopher Baldwin; Rochelle Banks; Curtis Bass; Zanda Bell; James Bouyer, Jr.; George Burns; Ryan Case; Jeffrey Clute; David Cousins; Dexter Cumberbatch; Brandyn Fox; Jeffrey Johnson; and Maia Nowell.[1]  The parties then engaged in discovery with respect to those plaintiffs.  During discovery, the parties agreed to substitute Bradley Byrnes as a sample plaintiff in place of Christopher Baldwin.

After the completion of discovery, the parties filed cross-motions for summary judgment. The court denied plaintiffs' motion for summary judgment in its entirety, granted defendant's motion for summary judgment on the meal-break claim, and denied defendant's motion with respect to the donning-and-doffing claim.  Thus, plaintiffs' donning-and-doffing claim was the only remaining claim for trial.  Subsequently, at the parties' request, the court dismissed the donning-and-doffing claim asserted by Officers Bass, Bell, and Baker and removed Officer Alphaek from the group of sample plaintiffs.

The court held a trial on the sample plaintiffs' donning-and-doffing claim from April 1, 2019, to April 5, 2019, and from April 8, 2019, to April 9, 2019.  During the trial, the court granted plaintiffs' motion to dismiss Officer Clute's claim, make Officer Chrislina Marshall a sample plaintiff, and remove Officer Rochelle Banks from the list of sample plaintiffs. Plaintiffs, therefore, proceeded through the trial with fifteen sample plaintiffs:  Officers Akpeneye, Allen, Alston, Antoine, Aslaksen, Bouyer, Burns, Byrnes, Case, Cousins, Cumberbatch, Fox, Johnson, Marshall, and Nowell.[2]  The court heard closing argument on December 18, 2019.

---

[1] Officer Alphaek's last name has been spelled as "Alpha-K" in some filings, but the court uses "Alphaek" because that is how his name appears in the amended complaint. Similarly, Officer Aslaksen's last name has been spelled as "Arlarken" in some filings, but, as reflected in the trial transcript ("Tr."), he testified that the correct spelling is "Aslaksen." Tr. 32 (Aslaksen).  Additionally, the court notes that Officer Nowell was identified in the operative complaint as Officer Bradley, but she testified during the trial that she changed her last name to "Bradley" after getting married in June 2017.  Id. at 729 (Nowell).

[2] In addition to the sample plaintiffs, the court heard testimony from Frank Miller (a former PFPA officer who is not a sample plaintiff), Chief Woodrow Kusse, Assistant Chief

## II. FACTS

This section contains the court's findings of fact, with respect to the sample plaintiffs, as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims. The court derives these facts from the parties' Joint Stipulation of Facts ("Jt. Stip."), the transcript of testimony elicited during the trial, and the exhibits admitted into evidence during the trial ("DX" or "JX").

### A. Duties and Authority

Plaintiffs are PFPA police officers.[3] See Jt. Stip. ¶ 4. The PFPA "is a law enforcement agency within the [United States] Department of Defense" ("DOD") and is "charged with protecting and safeguarding designated DOD personnel, resources, and facilities." Id. ¶ 1. PFPA officers "enforce laws enacted for the protection of persons and property, prevent breaches of the peace and suppress affrays or unlawful assemblies, and enforce rules or regulations with respect to such persons and property within the PFPA's jurisdiction." Id. ¶ 5. They may be required to "contain, control, and neutralize any threat to the safety and welfare of the DOD community or property in the event of sabotage attempts, armed intrusion, hostage taking, sniper or terrorist attacks, weapons of mass destruction, civil disobedience, barricade attempts or chemical accidents." Id. ¶ 6. "Officers may also be required to carry out surveillance, perform inspections, and ensure the security and protection of [United States] Government officials on the Pentagon Reservation and other assigned locations in the Washington, D.C. Metropolitan area." Id. ¶ 7. The Pentagon Reservation encompasses "approximately 238 acres and includes the Pentagon building [("Pentagon")], administrative offices, public transit, parking, support, industrial land uses, and green and open spaces." Id. ¶ 9.

Plaintiffs' police authority is limited outside of the PFPA's jurisdiction. See JX 5 at 1; see also id. (noting that, when not within the PFPA's jurisdiction, PFPA officers must "respect host agencies' authority and jurisdiction, and limit their law enforcement actions"). Officers commuting with their PFPA-issued firearm ("firearm") "may take immediate action to protect the health, safety, or welfare of a person from serious breaches of the peace . . . ." Id. at 10; see also id. (forbidding commuting officers from "effectuat[ing] traffic stops or tak[ing] police action for traffic infractions[,] . . . unless circumstances arise in which a traffic situation involves a serious breach of the peace"). Officers may take such action in Virginia under "limited Conservator of the Peace authority" but can only act with the "same authority as a private citizen" while in Maryland or Pennsylvania. Id. The PFPA warns officers that, if they "exceed

---

Gerald Plummer, and Major Steven Taylor. Mr. Miller testified for the sample plaintiffs, while the others testified for the defendant.

[3] Although the parties stipulated before trial that "[p]laintiffs are current and former PFPA police officers," Jt. Stip. ¶ 4, the sample plaintiffs testified during the trial that they are currently PFPA officers, see, e.g., Tr. 776 (Marshall), and plaintiffs' counsel suggested the same during his opening argument, see id. at 9 (plaintiffs' counsel) (discussing plaintiffs' practices in the present tense).

their authority," then they "subject both themselves and the Government to unnecessary liability" and "may be subject to criminal prosecution or administrative action." Id. at 2; accord id. at 10 ("PFPA employees must recognize their intervention in situations while off-duty . . . could result in potential civil liability on the part of the Government and on the part of the PFPA officer personally."). The PFPA further notes that officers are protected from tort liability when they

> take[] reasonable action, including the use of force, to (1) protect individuals from a crime of violence; (2) provide immediate assistance to individuals who have suffered or who have been threatened with bodily harm; or (3) to prevent the escape of individuals who the [officer] reasonably believes to have committed a crime of violence in the employee's presence.

Id. at 10. But that immunity only applies if the officer acts to "protect the victim of a crime of violence, rather than as an affirmative act to enforce State or local law." Id.

### B. Work Schedule and Compensation

Officers are assigned to work eighty hours per two-week pay period. E.g., Tr. 33 (Aslaksen). They work those hours in shifts of varying lengths. Jt. Stip. ¶ 8. For each shift, officers are assigned to a specific duty or post. Id. ¶ 9. Most of those posts are on the Pentagon Reservation. Id. Officers begin their shifts at roll call in the Pentagon Library and Conference Center before going to their posts.[4] Id. ¶¶ 28, 30; Tr. 1041 (Kusse). They must be in their uniforms and have their equipment at the start of their shift.[5] Jt. Stip. ¶ 28.

For their shifts, officers are compensated pursuant to an Administratively Determined pay scale and are eligible for overtime compensation if they work longer than scheduled. See id. ¶¶ 12-13. They are paid for their time from the start of their shift—which is normally the time roll call is scheduled to start—until the end of their shift. See id. ¶ 31; see also supra note 4 (noting that Officer Marshall does not begin her shift at roll call). They are not paid to don and doff their uniforms and equipment. Tr. 1045 (Kusse).

### C. Uniforms and Equipment

Officers must be in uniform and have certain equipment while working during their shift, Jt. Stip. ¶ 14, because of the "quasi-military nature of policing and the need for visibility in the basic police function," DX 1 at 1; see also JX 1 at 1 (noting that uniforms are necessary "to

---

[4] Despite the parties stipulating that "[r]oll call marks the beginning of every shift," Jt. Stip. ¶ 28, the trial testimony reflects at least one exception to that rule, see Tr. 780 (Marshall). For reasons that are not clear from the transcript, Officer Marshall has not attended roll call for the last ten years and instead starts her shift at her post—the Court Liaison and Evidence Buildings. Id.

[5] Officers may be assigned to a post requiring special equipment, but they do not need that equipment at roll call. See, e.g., Tr. 506 (Cumberbatch).

maintain a professional appearance"). The PFPA permits officers to don and doff their uniforms and equipment at home or at the Pentagon. Jt. Stip. ¶ 29. The PFPA provides locker rooms in the Pentagon that are located a few feet away from the armory and where roll call is conducted. Id. ¶¶ 29, 33. In the locker rooms, officers may get dressed (or undressed) and store their food, uniforms, equipment—with the exception of their firearm—and personal items. Id. ¶ 29; JX 3 at 2.

### 1. Uniform Components and Policy

PFPA officers have two types of uniforms—a Class A uniform and a Class B uniform. Jt. Stip. ¶ 16. The Class A Uniform consists of:

> (1) either a short-sleeved or long-sleeved shirt (or long-sleeved shirt with a sweater), depending on the time of year; (2) a duty jacket; (3) a navy blue eight-point hat, and (4) a black nylon or leather belt. Officers wearing a "Class A Uniform" must also wear their issued badge and brass nameplate. The "Class A Uniform" has optional items that officers may wear at their discretion, such as a dress blouse, a marksmanship badge, award pins, and a whistle with a chain.

Id. ¶ 17 (citations omitted). In contrast, "[t]he 'Class B Uniform' consists of a two-piece blue work uniform with optional baseball cap[;] . . . [the uniform] includes either a long- or short-sleeved shirt and trousers, and, depending on the weather, a sweater or turtleneck."[6] Id. ¶ 18. Regardless of the uniform type, officers must also wear "either black military-style lace-up oxford shoes or boots." Id. ¶ 20.

Although they can take their uniform home, see id. ¶ 29, officers cannot release their uniform to "any outside third party commercial service to launder, repair or dry clean their uniforms." JX 2. They may, however, launder their uniforms at home, Tr. 908 (Case), or give their uniforms to the on-site dry cleaners at the Pentagon, id.; accord JX 2.

### 2. Equipment Components and Policy

In addition to their uniforms, officers must wear a duty belt and a protective vest ("vest"), with exceptions being made for the latter in certain circumstances.[7] Jt. Stip. ¶¶ 22, 24. Officers are required to have the following items on their duty belt: firearm and holster (unless the officer is assigned to light duty), handcuffs with case, collapsible baton and holder, PFPA-issued Oleoresin Capsicum spray and holster, magazine pouch with three .40 S&W magazines (13

---

[6] For the sake of clarity, the court will use "uniform" to refer to both the Class A and Class B uniform.

[7] The duty belt is different from the belt that is a part of the Class A Uniform. Tr. 478 (Cumberbatch).

rounds each), and belt-loop holder for their radio case.[8]  Id. ¶ 22; Tr. 868 (Johnson) (noting that officers on light duty are not allowed to have a firearm).  Officers may, but are not required to, have the following items on their duty belt:  flashlight and holder; key holders; second set of handcuffs; pager and pager case; and cellular phone and case.  Jt. Stip. ¶ 23.

While not on duty, officers must either leave their firearm at the Pentagon armory or take the weapon home.  Tr. 1043 (Kusse).  Officers who store their firearm at the armory are required to pick it up before the start of their shift.[9]  See id. at 747 (Nowell).

The PFPA has a firearms policy that specifies three relevant conditions for officers who commute with their firearms.  See generally JX 3.  First, they must store the firearms in a specified manner during their commute.  Id. at 6.  An officer "must carry the service weapon on the [officer's] person, if in uniform.  If the [officer] is not in uniform, the service weapon must be carried concealed in a holster designed for the weapon, or secured in the 'life jacket' locking device within a carrying bag."  Id.  Second, the officer must safeguard his or her firearm at home; as soon as the officer arrives home, the officer is required to place the firearm in an "agency furnished service-weapon locking device," put the firearm in a lockbox, and keep the "lockbox in a secure area . . . ."  Id. at 7.  Third, an officer commuting with his or her firearm can only "travel directly between their permanent residence and duty station" except for "momentary and brief stops that are incidental to their commute."  Id. at 5.  Such stops include, but are not limited to, "voting, refueling, picking-up dry cleaning, picking-up take-out food, stopping at convenience stores, [and] picking up children from school and or daycare."  Id.  Officers may not stop to engage in off-duty employment, purchase or consume alcohol, visit businesses where the primary business is alcohol or adult entertainment, or participate in an activity that would reflect unfavorably upon the officer of the PFPA.  Id. at 5-6.

### 3. Plaintiffs' Firearm Practices

Most PFPA officers commute with their firearms.  Tr. at 1047 (Kusse) (estimating that ninety percent of officers commute with their firearm).  Indeed, Officers Fox, Case, Allen, Alston, Byrnes, Bouyer, Antoine, Aslaksen, and Cumberbatch travel to and from the Pentagon with their firearms.  Id. at 61 (Aslaksen), 237 (Alston), 289 (Allen), 401 (Bouyer), 496 (Cumberbatch), 521 (Fox), 650 (Antoine), 707 (Byrnes), 922 (Case).  Officer Nowell also commutes with her firearm unless she is travelling out of town or going somewhere not permitted by the firearms policy.  Id. at 746, 753 (Nowell).  Officer Johnson commuted with his firearm in the past, but no longer does so because he is assigned to a position—light duty—that does not include a service weapon.  Id. at 868 (Johnson).  Officers Cousins and Marshall also

---

[8] Officers were previously required to have disposable rubber gloves, a CPR pocket mask, and a holder for that mask on their duty belt.  Jt. Stip. ¶ 22 n.3.  But the PFPA changed its policy; officers are no longer required to have the CPR items, and officers merely need to have the access to gloves while on duty.  Id.

[9] Officer Marshall is an exception to the rule; she is allowed to store her firearm at her post, the evidence vault.  Tr. 810 (Marshall).

previously came to work with their firearms, but they now store their firearms at the Pentagon. Id. at 810-11 (Marshall), 975 (Cousins).  Officers Burns and Akpeneye do not commute with their firearms.  Tr. 79 (Akpeneye), 143 (Burns).

### 4. Plaintiffs' Donning-and-Doffing Practices

The sample plaintiffs differ in where they don and doff the uniforms and equipment, as well as in their rationales for their practices.  Officer Akpeneye dons and doffs at the Pentagon because of the weapons policy.  Id. at 121 (Akpeneye).  He does not want to be in his uniform without his firearm, and he does not want to commute with his firearm because of the travel restrictions that would apply.  Id. at 121-22.

Officer Allen normally dons and doffs at the Pentagon but will get dressed at home if he is behind schedule.  Id. at 293-94, 313 (Allen).  He prefers to put on his uniform and equipment at the Pentagon because of safety considerations; specifically, Officer Allen is concerned that he is a target for antipolice violence if he commutes in his uniform.  Id. at 313-14.  He also changes at the Pentagon because of his belief that officers, pursuant to PFPA policy, are subject to restrictions on what they can do and where they can go while commuting in uniform.  Id. at 314. But see id. at 315 (acknowledging that the travel restrictions he identified apply if an officer commutes with his or her firearm).  Officer Allen's personal vehicle has a Thin Blue Line sticker, which makes him identifiable as a police officer.  Id. at 376-77.

Officer Alston dons and doffs at home some days and at the Pentagon on other days.  Id. at 236 (Alston).  He prefers, however, to change at the Pentagon because he (1) is more comfortable driving in civilian clothes, (2) does not have to worry that he will wrinkle his uniform while commuting, and (3) is concerned that being in uniform during his commute poses a risk to his safety.  Id.

Officer Antoine generally dons and doffs his shirt and pants at home while completing the rest of the process—putting on the duty belt and vest—at the Pentagon.[10]  Id. at 641 (Antoine); see also id. at 663 (noting that he has, on occasion, come to work in civilian clothes and changed entirely at the Pentagon).  At the end of his shift, he takes his duty belt and vest home with him rather than going to the locker room to doff any equipment.  See id. at 663-64 (noting that he typically goes directly to his vehicle rather than stopping by the locker room).  He prefers to primarily don and doff at home because (1) he needs to take his children to school, and (2) his post is far away from the locker room such that it is quicker to just go home.  Id. at 666. Officer Antoine commutes in his uniform despite being concerned that his safety is endangered if the public identifies him as an officer while he is in transit.  See id. at 680 (indicating that he would have safety concerns if he did not cover up his shirt).  He ameliorates those concerns by commuting with a jacket over his uniform.  Id.

---

[10] Officer Antoine, however, changed at the Pentagon when he was assigned to a different post.  Tr. 664-66 (Antoine).

Officer Aslaksen dons and doffs in the Pentagon locker room. Id. at 41-42 (Aslaksen). He prefers to change in the locker room because the PFPA made that area available, and he has safety concerns regarding commuting in uniform based on his knowledge of officers at the California Department of Corrections (his prior employer) being targeted when they were off duty but still in their uniforms. Id. at 45-46. Despite his concerns with respect to being targeted for being a police officer, Officer Aslaksen previously made himself identifiable as a police officer while off duty by commuting in a vehicle with a Thin Blue Line sticker. Id. at 65.

Officer Bouyer changes at the Pentagon. Id. at 430 (Bouyer). He chooses to dress there based on concerns that commuting in uniform places him in danger because (1) some people do not like police officers, and (2) he has limited police powers outside of the Pentagon Reservation. Id. at 430-31.

Officer Burns typically dons and doffs at the Pentagon, but he has worn his uniform home on some occasions. Id. at 143, 173-74 (Burns). He too prefers to change at work due to safety concerns related to being identified as a police officer while off duty in public. Id. at 165. Despite that concern, Officer Burns drives to work in a vehicle with a Thin Blue Line sticker even though people may identify him as a police officer because of that sticker. Id. at 178.

Officer Byrnes dons and doffs his uniform and vest at home, but deals with the duty belt in the Pentagon parking lot. Id. at 697-98 (Byrnes). He used to wear a shirt or something else to cover his uniform while he was commuting, but he has not done so in quite a while. Id. at 719. He commutes in a vehicle with a Thin Blue Line tow hitch, which makes him identifiable as a police officer when he is off duty. See id. at 720-721.

Officer Case dons and doffs at work, but he frequently dressed at home prior to 2013. Id. at 921-22 (Case). He changed his donning-and-doffing practice in 2013 because he began working at a post where he is relieved early but has to remain at the Pentagon until his shift is over. Id. at 907-08, 910. He uses the time between being relieved and the end of his shift to change out of his uniform. Id. at 909-10.

Officer Cousins generally dons and doffs in the Pentagon locker room, but he also dresses at home some days. Id. at 941, 983 (Cousins). He does not bring his equipment home (with the exception of his radio battery) because he lives thirty-five miles from the Pentagon. Id. at 984. He also prefers to dress at the Pentagon because of safety concerns; he is afraid of being targeted or ambushed if he wears his uniform while off duty. Id. at 969.

Officer Cumberbatch sometimes dons and doffs at home and other times dresses at the Pentagon. Id. at 464 (Cumberbatch). But he rarely comes to work in full civilian attire. See id. at 498-99 (explaining that he will come to work in entirely civilian clothes on the "rare occasion" when he does not have a clean uniform). He generally finishes getting ready at the Pentagon after arriving dressed in his uniform pants and (1) vest and shirt, which he conceals under a hooded sweatshirt or civilian jacket, id. at 464, 497; or (2) vest, which he covers with a t-shirt, id. at 465, 498. See also id. at 498 (agreeing that the main difference is whether he arrives at the Pentagon wearing the shirt that is part of his uniform). Although his practices vary, he chooses

his specific routine to account for activities he may want to do after work and manage safety concerns he has related to being identified as a police officer. Id. at 490, 492, 497.

Officer Fox also changes at his home and the Pentagon. Id. at 519 (Fox). He dons and doffs at the Pentagon 75% of the time and at home the other 25% of the time. Id. at 520. He dresses at home if he has the next day off, is relieved late from his post, has something going on with his family, or needs to get home immediately. Id. at 519.

Officer Johnson dons and doffs at home. Id. at 865 (Johnson). He changes there because it is more convenient; he does not want to go to work earlier than necessary, and he lives close enough to the Pentagon that he can go home to change if he wants to go out after work without wearing his uniform. Id. Additionally, Officer Johnson chooses to don and doff at home because he does not have children, so there is less risk associated with storing his firearm at home. Id.

Officer Marshall commuted in her uniform at the beginning of her career. Id. at 811 (Marshall). But she now dons and doffs at the Pentagon because she changes into gym clothes and exercises towards the end of her shift. Id. She did not change her routine because of safety concerns. Id. at 815. She commutes in a vehicle with a Thin Blue Line sticker, which makes her identifiable as a police officer. See id. at 814-15.

Officer Nowell dons and doffs at the Pentagon. Id. at 732 (Nowell). She dresses in the locker room because of safety concerns. Id. at 754. Officer Nowell does not feel safe commuting in her uniform because she is aware of non-PFPA officers who have been the target of violent attacks. Id. at 754, 762-63. Officer Nowell also believes she is safer dressing at the Pentagon because she feels obligated to provide police assistance while in uniform but is concerned that others will not recognize her as an officer due to her car not having any identifying markers. Id. at 754.

In sum, plaintiffs embrace a diverse range of donning-and-doffing practices. Some change only at the Pentagon, one does so only at home, and others either vary their practice or complete part of the process at home and the remainder at the Pentagon. For some plaintiffs, their practices have not been consistent over time as they altered their routine over time in response to changing circumstances. Plaintiffs' explanations for their routines are equally diverse; specifically, plaintiffs identified comfort, convenience, post location, safety concerns, jurisdictional limitations, and other considerations. Plaintiffs are all in agreement, however, that they are not required to change at work but rather can choose where they don or doff based on their personal preference. E.g., id. at 124 (Akpeneye).

### III. LEGAL STANDARD

The question in this case is whether plaintiffs are entitled to overtime compensation for the time they spend donning and doffing their uniform and equipment when those activities are performed before or after their shifts. The answer depends on the FLSA (as amended) and the applicable regulatory guidance. See IBP, Inc. v. Alvarez, 546 U.S. 21, 24 (2005) (reviewing the

FLSA); Bamonte v. City of Mesa, 598 F.3d 1217, 1220-23 (9th Cir. 2010) (reviewing the FLSA and regulatory guidance).

### A. The FLSA and the Portal Act

The FLSA governs, among other things, overtime compensation. 29 U.S.C. §§ 201-217; see also Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602 (1944) (stating that the FLSA's purpose is to "guarantee[] compensation for all work . . . engaged in by [covered] employees"). Under that law, it is illegal for an employer to "employ" an employee for a workweek of more than forty hours unless the employee receives overtime compensation for the time spent employed in excess of forty hours. 29 U.S.C. § 207(a). Police officers, however, are treated differently; a public agency cannot lawfully "employ" a police officer for more than 171 hours over a twenty-eight day pay period (or a proportional number of hours for shorter pay periods) unless the officer is paid overtime for the excess hours. Id.; 29 C.F.R. § 553.201 (2015); see also 29 U.S.C. § 207(k) (authorizing the Secretary of Labor to promulgate regulations setting the number of hours police officers must work to receive overtime). Officers' eligibility for overtime, therefore, depends on how many hours they are employed. See 29 U.S.C. § 207(a)(1) (explaining that overtime depends on how long an employer "employs" the employee). In this respect, "'[e]mploy' includes to suffer or permit to work." Id. § 203(g).

Congress did not define "work" within the FLSA. See id. § 203 (definitions). The United States Supreme Court ("Supreme Court") filled that gap by defining the term as any "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursed necessarily and primarily for the benefit of the employer and his business." Alvarez, 546 U.S. at 25 (quoting Tennessee Coal, 321 U.S. at 598). Guided by that definition, the Supreme Court held that employees were entitled to compensation for activities that were preliminary or postliminary to the principal activity for which they are employed. Id. at 27.

Congress responded to the Supreme Court's interpretation of the FLSA by passing the Portal Act, which amends the FLSA and creates an exception to the FLSA's general rule that employees must be paid for all work. See Bobo v. United States, 136 F.3d 1465, 1467 (Fed. Cir. 1998); see also 29 U.S.C. § 251(a) (noting Congress's finding that that the FLSA "has been interpreted judicially" in a manner that "creat[es] wholly unexpected liability"). The Portal Act is primarily concerned with defining the beginning and ending of the workday, Alvarez, 546 U.S. at 34-37; Congress "distinguish[ed] between activities that are essentially part of the ingress and egress process, on the one hand, and activities that constitute the actual 'work of consequence performed for an employer,' on the other hand." Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. 27 (2014) (Sotomayor, J., concurring) (quoting 28 C.F.R. § 790.8 (2014)). Specifically, Congress eliminated employers' responsibility to compensate employees for "activities which are preliminary or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a); accord Alvarez, 546 U.S. at 26-27. But that limiting principle does not relieve employers from the obligation to pay for some activities performed before or after a shift. See Steiner v. Mitchell, 350 U.S. 247, 252-53 (1956). Indeed, activities performed by an employee "before or after the regular work shift" that are "an integral and indispensable part of the

principal activities" of the employee are themselves "principal activities" and, thus, are not excluded from FLSA coverage by the Portal Act. Id.; accord Alvarez, 546 U.S. at 29-30.

Even if employees are performing otherwise compensable work, they are not entitled to overtime compensation for preshift or postshift activities that require a de minimis amount of time. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946) (noting that the FLSA does not require employers to pay employees for "a few seconds or minutes of work beyond the scheduled working hours"). While "the period that is normally regarded as the cut-off for de minimis overtime is 10 minutes, that number has not been treated as a rigid maximum." Carlsen v. United States, 521 F.3d 1371, 1380 (Fed. Cir. 2008). Indeed, activities that require even more time can still be de minimis depending on "the practical administrative difficulty of recording additional time, the aggregate amount of compensable time, and the regularity of the work." Id.

In sum, there is a three-part test for determining whether an employee is entitled to overtime compensation for an activity performed before or after a shift. The employee must be engaged in an activity that (1) constitutes work, (2) is a principal activity (which is satisfied if the activity is integral and indispensable to a principal activity), and (3) requires more than a de minimis amount of time. Bamonte, 598 F.3d at 1224; see also Abbey v. United States, 124 Fed. Cl. 397, 401 (2015). The employee bears the burden of establishing all three elements. Whalen v. United States, 93 Fed. Cl. 579, 587 (2010).

**B. Regulatory Guidance**

There is regulatory guidance that fleshes out the contours of the FLSA as amended by the Portal Act. As a general matter, the United States Office of Personnel Management's ("OPM") regulations concerning compensation apply to plaintiffs because they are federal employees. 29 U.S.C. § 204(f). Because the OPM's application of the FLSA must be consistent with the United States Department of Labor's ("DOL") interpretation, courts addressing federal employees' FLSA claims have also considered the DOL's reading of the FLSA. See Billings v. United States, 322 F.3d 1328, 1334 (Fed. Cir. 2003) (noting that the OPM's guidance must be in harmony with the FLSA's purpose and DOL regulations); Havrilla v. United States, 125 Fed. Cl. 454, 463 (2016) (reviewing DOL and OPM regulations when evaluating the claims of federal employees). The DOL's interpretation of the FLSA, therefore, is relevant to the instant case.

The DOL has issued guidance on when donning and doffing qualifies as a principal activity. See Akpeneye v. United States, 138 Fed. Cl. 512, 542 (2018) (collecting DOL publications). Most recently, the DOL reiterated in an advisory memorandum its "longstanding position that if employees have the option and ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant." U.S. Dep't of Labor, Wage & Hour Div., Wage & Hour Advisory Memorandum No. 2006-2, at 3 (May 31, 2006) ("DOL Memorandum" or "Memorandum"). This interpretation, however, lacks the force of law because it appears in an advisory opinion. See Christensen v. Harris Cty., 529 U.S. 576, 587 (2000); accord Bamonte, 598 F.3d at 1223 (concluding that the DOL's statements on compensation under the Portal Act lack the force of law because they are "general policy statements"). The DOL's position, nonetheless, reflects "a body of experience and informed

judgment to which courts and litigants may properly resort for guidance," Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), and is "entitled to respect . . . to the extent that [it] ha[s] the 'power to persuade,'" Christensen, 529 U.S. at 587 (quoting Skidmore, 323 U.S. at 134). The court, as explained in its prior summary judgment decision in this case, is persuaded that the DOL's interpretation in the Memorandum accurately reflects the law and has adopted it.[11] Akpeneye, 138 Fed. Cl. at 542. In sum, employees are not engaged in a principal activity when they don and doff their uniforms or equipment if they have the option and ability to dress at home.

## IV. ANALYSIS

Plaintiffs' success in this case is contingent on them establishing that donning and doffing constitutes work, is a principal activity, and requires more than a de minimis amount of time. Bamonte, 598 F.3d at 1224; see also Whalen, 93 Fed. Cl. at 587 (noting the burden). Because their claim fails if they fail to establish each of those elements, the court need not address the elements in order or necessarily address all of them. See Bamonte, 598 F.3d at 1224. As such, the court begins by evaluating whether plaintiffs have established that donning and doffing is a principal activity because that is the primary area of disagreement between the parties.

The DOL Memorandum is the starting point for the principal activity analysis. Pursuant to the Memorandum, employees who don and doff at the workplace are not engaged in a principal activity if they have the option and ability to do so at home. DOL Memorandum 3. And, as relevant here, employees have the option and ability to don and doff at home if they change clothes at work as a matter of preference rather than because of a law, a regulation, an employer policy, or the nature of the work. Bamonte, 598 F.3d at 1231. The court concludes that the sample plaintiffs have the option and ability to change at home because (1) the PFPA permits it, and (2) eleven of the sample plaintiffs acknowledge that they currently fully or partially dress at home at least some of the time (or have done so in the past). The fact that a significant number of the sample plaintiffs don and doff, at least in part or on occasion, at home undermines any notion that the option to change at home is illusory. Moreover, the court's conclusion is buttressed by the fact that the sample plaintiffs acknowledge that they choose where to change based on their personal preference. Even if the sample plaintiffs had not explicitly acknowledged that their decision was a matter of personal preference, the officers who

---

[11] The court is not breaking new ground by following the DOL's interpretation; indeed, other courts have also focused on the DOL's position when considering whether employees are entitled to compensation when they can don and doff at home. E.g., Bamonte, 598 F.3d at 1228 ("We are similarly persuaded that the 2006 DOL memorandum . . . should be considered in our resolution of this case."); Lesane v. Winter, 866 F. Supp. 2d 1, 6 (D.D.C. 2011) ("The Court sees no reason to disagree with the DOL's view that employees who genuinely have the 'option and ability' to change clothes at home should not be compensated for the time it takes to do so."); Haight v. The Wackenhut Corp., 692 F. Supp. 2d 339, 345 (S.D.N.Y. 2010) (deeming "[m]ost significant[]" the fact that security officers "are not required to change on [the] employer's premises and have the option of changing at home").

change at work testified that they do so for reasons—concerns over safety, restrictions, and liability—that reflect their own preferences rather than mandates. See id. (explaining that police officers are choosing where to dress based on their preferences when they decline to change at home because of safety, comfort, and exposure concerns). In short, the sample plaintiffs are not engaged in a principal activity when they don and doff because they have the option and ability to do so at home.

Plaintiffs' counterarguments are not convincing. First, relying on Perez v. Mountaire Farms, Inc., 610 F. Supp. 2d 499 (D. Md. 2009), plaintiffs argue that their option to change at home is illusory because the PFPA provides locker rooms, supplies the uniforms and equipment, and offers cleaning services for the uniforms. Plaintiffs' reliance on Perez is misplaced because the decision is distinguishable. Perez involved employees of a chicken processing plant who sought compensation for the time they spent donning and doffing their uniforms and protective equipment. Id. at 502-03. The district court in Perez held that the employees lacked a meaningful opportunity to change at home because (1) "it would be onerous and . . . impractical for employees to take home [their protective equipment]," (2) "it is wholly illogical for employees to take home smocks soiled with chicken blood and fat," and (3) "no witnesses . . . testified that [employees taking home their uniforms] is a normal occurrence."[12] Id. at 519-20. None of those circumstances is present here. First, the court, having viewed the uniform and equipment during the trial, finds that it would not be onerous or impractical to take both to and from the Pentagon. Indeed, the sample plaintiffs did not testify that doing so would be onerous or impractical, there is ample testimony reflecting that officers found it possible to take their uniform and/or equipment home, and the fact that some officers change at home further undermines any notion that doing so is unrealistic. Second, the sample plaintiffs' uniforms are not, as a matter of course, covered in blood or other unsanitary products at the end of their shift. Third, the sample plaintiffs testified that there are a number of officers who dress at home either regularly or periodically. In short, the sample plaintiffs do not advance their cause by relying on the Perez decision.

Plaintiffs next argue that the option to change at home is illusory because off-duty officers in uniform have safety concerns, are subject to travel restrictions, face liability risks, and must mislead the public if they dress at home. The court is not swayed. The sample plaintiffs

---

[12] The district court, in passing, attributed some significance to the fact that the employer had installed lockers: "If changing at home were a bona fide option, there would be no real need for employee lockers or for [the employer] to incur the cost of installing them." Perez, 610 F. Supp. 2d at 519. It is unclear from the opinion whether the aforementioned statement is dicta or holding. See id. at 519-20 (discussing a variety of reasons why the employees lacked the option and ability to change at home). To the extent that the statement is part of the holding, the court does not agree with the reasoning. The mere existence of lockers does not indicate that employees lack the ability to change at home; an employer may install lockers to provide employees with the option to dress at work (which would arguably be impossible without a locker to store clothes) or store items such as food during the shift. Moreover, the district court's determination that the existence of the lockers is significant must be read in the context of facts that, as discussed below, are materially different than the instant case.

may have well-founded concerns that commuting in their uniforms is a safety risk because of the dangers associated with being identifiable as an officer while off duty.[13] But those concerns are of no import to whether they have a meaningful ability to change at home. An officer's decision to dress at the Pentagon because of concerns that it is not safe to commute in uniform reflects that officer's preference, which does not render illusory the option to dress at home. See Bamonte, 598 F.3d at 1231 (noting that officers choosing to not dress at home due to "safety concerns" are making a decision based on "preferences rather than mandates" such that they "retain the option and ability to don and doff . . . at home"). Moreover, plaintiffs' focus on those safety concerns is also misplaced because the option to change at home is not illusory if officers can mitigate their concerns by covering up their uniform, see Dager v. City of Phoenix, 646 F. Supp. 2d 1085, 1100 (D. Ariz. 2009) (declining to compensate police officers for their commute time because "officers concerned about being identified or harassed while off duty can easily cover their uniforms during their commutes"), and the sample plaintiffs acknowledge that they can conceal their uniform while commuting.

Plaintiffs' focus on the travel restrictions is also unpersuasive. As an initial matter, plaintiffs argue that they lack a meaningful option to change at home because they are subject to travel restrictions while in uniform. But the evidence introduced during the trial reflects that, pursuant to the weapons policy, officers are only so limited if they travel with their firearms—whether the officers are in uniform is of no import.[14] The court, therefore, focuses its inquiry on the consequences of the weapon policy. There is no indication that officers are deprived of a meaningful ability to don and doff at home because of that policy. Indeed, the idea that officers feel constrained to donning and doffing at the Pentagon based on a desire to freely travel after their shifts is belied by the fact that most plaintiffs subject themselves to travel restrictions by

---

[13] The court need not and does not make a finding with respect to whether the sample plaintiffs have safety concerns. There is conflicting testimony on the issue. Indeed, some officers testified that there are safety risks associated with being identifiable as an officer while off duty but also acknowledged commuting in their uniform and/or driving a car with a decal associated with police officers.

[14] To support their understanding that officers in uniform must commute with their firearms, plaintiffs direct the court to a portion of the weapons policy in which the PFPA states that officers in transit "must carry the [firearm] on the employee's person, if in uniform. If the employee is not in uniform, the service weapon must be carried concealed in a holster . . . or secured in the 'life jacket' locking device . . . ." JX 3 at 6. Plaintiffs' understanding is seemingly guided by the first sentence in which the PFPA described how officers must carry their firearm if in uniform. Plaintiffs' interpretation is problematic because, when applied in connection with the next sentence in which the PFPA describes how officers not in uniform must travel with their firearms, the result is a requirement that all officers commute with their firearms regardless of whether they are in uniform. But plaintiffs explicitly acknowledged during trial that was not the case as some of the sample plaintiffs leave their firearms at the Pentagon after their shifts. Thus, the court reads the quoted language as the PFPA explaining how each officer must secure his or her firearm when travelling with it rather than imposing a requirement to travel with the firearm.

commuting with their firearms. Even if officers were influenced by the policy when deciding where to don and doff, they are not deprived of a meaningful option to dress at home because of the travel restrictions. See Musticchi v. City of Little Rock, Ark., 734 F. Supp. 2d 621, 626 (E.D. Ark. 2010) (holding that officers are not entitled to compensation for donning and doffing their uniform despite "restriction[s on] officers' travel once they are in uniform"); cf. Bobo, 136 F.3d at 1468 (analyzing whether agents spent a de minimis amount of time on work activities during their commute and noting that "the prohibition on personal stops during [agents'] commute[s] . . . does not make their time compensable").

Plaintiffs also argue that they lack a meaningful ability to change at home because they face potential civil liability if they commute in their uniforms. Specifically, they assert that the public expects uniformed officers to provide police assistance in certain circumstances, and officers could be subject to civil liability for providing such assistance during their commutes because they have limited authority when they are not within the PFPA's jurisdiction. Otherwise stated, plaintiffs contend that they cannot dress at home because they are concerned that they will accede to public expectations and then exceed their own authority when they provide assistance. This argument is unpersuasive for a multitude of reasons. First, plaintiffs do not identify any officer who testified that he or she decided where to change based on liability concerns.[15] Second, a significant number of the sample plaintiffs commute in their uniform, which undermines the notion that officers' option to dress at home is illusory. Third, plaintiffs could mitigate their concerns by covering up their uniform during their commute because they would no longer be identifiable as police officers. Fourth, plaintiffs fail to explain why they cannot act within their authority if they stop to assist people who need help.

Plaintiffs further argue that the option to dress at home is illusory because those who commute in their uniforms must engage in subterfuge. Specifically, plaintiffs contend that it is unacceptable to require officers to mislead the public by presenting themselves as police officers with the attendant power even though they lack meaningful authority outside of the PFPA's jurisdiction. But the sample plaintiffs did not testify that they considered the opinions of others when deciding where to dress, and they could mitigate any concerns with respect to misleading the public by covering up their shirt while commuting. See Dager, 646 F. Supp. 2d at 1100 (noting that officers could avoid being identified by covering up their uniforms during their commute).

Even if each of the aforementioned considerations is not enough in isolation, plaintiffs argue that they are deprived of a meaningful option to dress at home based on the combined effect of their safety concerns, travel restrictions, liability risks, and apprehension over misleading the public. Plaintiffs' contention is again undermined by the fact that many of the

---

[15] Officer Bouyer, who plaintiffs rely on in support of their argument, testified that he chooses to dress at work because officers have limited jurisdiction but did not frame his concerns around the concept of liability. Tr. 430-31 (Bouyer). When asked why he dressed at work, he responded: "For me, safety as far as wearing my uniform, because we have a limited jurisdiction and not everybody loves police officers. It's just a safety thing for me." Id. In short, Officer Bouyer dresses at home because he is concerned for his safety rather than due to worries regarding being held personally liable for helping others.

sample plaintiffs change at home at least in part and on occasion.  Additionally, plaintiffs fail to demonstrate how their decisions, even if influenced by all of the noted considerations, on where to don and doff are the product of anything other than their preferences.  Indeed, they fail to identify any mandate that flows from the law, employer, or nature of the work that prevents them from dressing at home.  Moreover, the sample plaintiffs' safety, liability, and honesty concerns are easily mitigated by covering up their uniforms, while the travel restrictions seemingly have no deterrent effect as most officers willingly subject themselves to those limits by commuting with their firearms.  In short, plaintiffs still have the meaningful option and ability to dress at home despite the combined effect of the aforementioned considerations.

In sum, the sample plaintiffs are not engaged in a principal activity when they don and doff their uniforms and equipment because they have the option and ability to do so at home.  Thus, the sample plaintiffs are not entitled to overtime compensation for the time they spend donning and doffing.

## V.  CONCLUSION

The court is grateful for plaintiffs' service as PFPA officers.  Unquestionably, they are valiant public servants who every day place their lives on the line while safeguarding America's military installations.  The court, unfortunately, cannot award compensation based on nobility.  Here, plaintiffs are requesting overtime compensation for the time they spend donning and doffing their uniform and equipment before and after their shifts.  But, pursuant to the facts elicited during the trial, the sample plaintiffs are not engaged in a principal activity when they are putting on or taking off their uniforms and equipment such that the time for those activities is not compensable.  Simply stated, the sample plaintiffs are not engaged in a compensable activity under the FLSA, as amended by the Portal Act, when they are changing.  Accordingly, the court **DISMISSES** the sample plaintiffs' claims.  The parties shall file a joint status report **by no later than Friday, January 31, 2020,** in which they suggest a process for the second phase of the litigation.[16]

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

---

[16] Based on the court's holding as to the sample plaintiffs, the most efficient course of action may be for the parties to request that the court direct the entry of judgment for defendant with respect to all of the plaintiffs' claims.